# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| JOHN DOE #11, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case Nos. 3:22-cv-00338** |
| | ) | |
| WILLIAM B. LEE, in his official capacity | ) | **Judge Richardson** |
| as Governor of the State of Tennessee, and | ) | |
| | ) | |
| DAVID B. RAUSCH, in his official | ) | |
| capacity as Director of the Tennessee | ) | |
| Bureau of Investigation, | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFF JOHN DOE #11'S MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

---

Defendants, Governor William B. Lee and Director of the Tennessee Bureau of Investigation ("TBI") David B. Rausch, oppose Plaintiff's motion for a temporary restraining order and preliminary injunction. (D.E. 12, 13.) Plaintiff has failed to establish he is entitled to the extraordinary injunctive relief requested; his motion should be denied.

## BACKGROUND

Plaintiff, a sexual offender, seeks a preliminary injunction on the basis of his challenge to the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004, Tenn. Code Ann. § 40-39-201 to -218. ("the Act"). Plaintiff contends that the Act "is unconstitutional as applied to him" because the Act's "enforcement against [him], based

solely on an offense that occurred before [the Act's] effective date, violates the Ex Post Facto Clause." (D.E. 13, PageID# 71.)

Plaintiff was convicted of criminal sexual conduct in Michigan in 2002. (D.E. 1, PageID# 4.) His victim was his 14-year-old stepchild. (*Id.*) As a result of this offense, when Plaintiff moved to Tennessee less than two years ago in October 2020, he was required to register as a sexual offender. (*Id.* at 5.) He has registered since approximately February 2022. (*Id.*)

Plaintiff now alleges, in two counts, that (1) the Act is unconstitutional as applied to any offender with an offense before the Act's effective date and (2) the Act is unconstitutional as applied to Plaintiff. (D.E. 1, PageID# 18-19, ¶¶ 75, 80.) He seeks injunctive relief (1) prohibiting Defendants from enforcing the Act against him and (2) removing him from the SOR. (D.E. 12, PageID# 58.)

## REASONS FOR DENYING INJUNCTIVE RELIEF

### I. Legal Standards

#### A. Standard for Preliminary Injunction

A preliminary injunction is an "extraordinary remedy designed to preserve the relative positions of the parties until a trial on the merits can be held." *Tenn. Scrap Recyclers Ass'n. v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009). Federal Rule of Civil Procedure 65 governs the Court's power to grant a preliminary injunction. In determining whether to grant a preliminary injunction, a district court must consider the following four factors: (1) the movants' likelihood of success on the merits; (2) whether the movants will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *See, e.g., Workman v. Bredesen*, 486 F.3d 896, 905 (6th Cir. 2007). Absence of the first factor is dispositive. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 362 (6th Cir. 2008) (finding that, because the plaintiffs had little likelihood of success on the

2

merits, the court "need not address the other three factors"). And "[t]he demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002). A preliminary injunction should be granted only if the movants "prov[e] that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

"In deciding a motion for preliminary injunction, a court may consider the entire record, including affidavits and other hearsay evidence." *Patel v. AR Grp. Tennessee, LLC*, No. 3:20-CV-00052, 2020 WL 5849346, at *4 (M.D. Tenn. Oct. 1, 2020); *see* 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2949 (3d ed.) (explaining that at this stage, courts may consider hearsay and other normally inadmissible evidence). Further, the Court can take "judicial notice of historical, political, or statistical facts, or any other facts that are verifiable with certainty." *Youkelsone v. FDIC*, 910 F. Supp. 2d 213, 221 (D.D.C. 2012). And "[t]he Court can take judicial notice of government statistics." *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co*., 630 F. Supp. 2d 255, 263 n.3 (E.D.N.Y. 2008); *see also* Fed. R. Evid. 201; *United States v. Esquivel*, 88 F.3d 722, 726-27 (9th Cir. 1996) (taking judicial notice of census data compiled by the United States Department of Commerce); *United States v. Neal*, 577 F. App'x 434, 452 n.11 (6th Cir. 2014) ("[C]ourts may take judicial notice of government statistics such as United States census data.").

### B. Standard for Temporary Restraining Order

"A [temporary restraining order] is an extraordinary remedy designed to protect the status quo pending a preliminary injunction." *Knight v. Montgomery County*, No. 3:19-cv-00710, 2019 WL 13109761, at *1 (M.D. Tenn. Aug. 16, 2019). The same four-factor test for a preliminary injunction applies to motions for temporary restraining orders. *Carter v. Tennessee Dep't of Children's Services*, No. 3:22-cv-00247, 2022 WL 1144134, at *1 (M.D. Tenn. Apr. 18, 2022);

3

*see* Fed. R. Civ. P. 65(a) – (b).  However, to obtain a temporary restraining order, "a threat of an *immediate*, irreparable harm must be present."  *Id*. at *2 (citing Fed. R. Civ. P. 65(b)(1)(A)).

## II.   Plaintiff Has Not Shown a Significant Likelihood of Success on the Merits of His Ex Post Facto Claim.

Plaintiff is unlikely to succeed in demonstrating by the clearest proof that the Act's regulation of sexual offenders is so punitive as to negate the General Assembly's intent to establish a civil regulatory scheme.  "The Constitution provides that "No State shall . . . pass any . . . ex post facto Law."  U.S. Const. art. I, § 10, cl. 1.  The Ex Post Facto Clause prohibits state legislatures from enacting a law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."  *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 71 U.S. 277, 326 (1866)).  The clause "does not bar *all* retroactive lawmaking, but only retroactive punishment."  *Does #1-5 v. Snyder*, 834 F.3d 696, 699 (6th Cir. 2016).

Courts employ a two-part intents-effects test to determine whether a law inflicts retroactive punishment.  First, "[a] court must ascertain whether the legislature intended the statute to establish civil proceedings."  *Seling v. Young*, 531 U.S. 250, 261 (2001).

Second, a court will accept a state legislature's intention to establish civil proceedings unless the challenging party provides the clearest proof, "by reference to a variety of factors, considered in relation to the statute on its face," that a statute is punitive in purpose or effect.  *Seling*, 531 U.S. at 261-62 (quotation marks and citations omitted).  On this second part, courts consider the following factors:

> (1) Does the law inflict what has been regarded in our history and traditions as punishment?
> (2) Does it impose an affirmative disability or restraint?
> (3) Does it promote the traditional aims of punishment?
> (4) Does it have a rational connection to a non-punitive purpose?
> (5) Is it excessive with respect to this purpose?

4

*Snyder*, 834 F.3d at 701 (citing *Smith v. Doe*, 538 U.S. 84, 97 (2003)). "This is a challenging standard for plaintiffs." *Hope v. Commissioner of Indiana Dept. of Correction*, 9 F.4th 513, 530 (7th Cir. 2021) (en banc).

Plaintiff has assumed for present purposes that the Act is civil in intent. (D.E. 13, PageID# 79.) So, Plaintiff's motion turns on his argument that the Act is punitive in effect. (D.E. 13, PageID# 85; D.E. 1, PageID# 19, ¶ 79.)

To support his argument, Plaintiff relies heavily on the Sixth Circuit's 2016 decision in *Snyder*. Defendants maintain that *Snyder* was wrongly decided. Regardless, though, *Snyder* is not controlling on the issues presented here. *Snyder* held, based on the record developed in that case, only that Michigan's sex offender registration act imposed punishment on Tier III offenders—who must register for life—and that its retroactive application was unconstitutional. 834 F.3d at 705-06, Mich. Comp. Laws § 28.725a(3) (2013). Plaintiff is not required to register for life. Tenn. Code Ann. § 40-39-207(i)(4)(B). And the conclusions reached in *Snyder* cannot merely be transposed to Tennessee's Act without presentation of the same proof considered in *Snyder*. Further, the district court opinions extending *Snyder* to hold the Act unconstitutional upon which Plaintiff relies all also involved offenders who were required to register for life.[1] Plaintiff has not cited, and Defendants have not found, a single case holding a five-year registration requirement unconstitutional.

---

[1] *Reid v. Lee*, No. 3:20-cv-00050, 2022 WL 1050645, at *9 (M.D. Tenn. Apr. 7, 2022) (violent sexual offender); *Does #1-9 v. Lee*, No. 3:21-CV-00590, 2021 WL 5761039, at *3 (M.D. Tenn. Dec. 3, 2021) (violent sexual offenders); *Doe #1 v. Lee*, No. 3:16-CV-02862, 518 F. Supp. 3d 1157, 1189 (M.D. Tenn. 2021) (one violent sexual offender and one offender against children); *Doe v. Rausch*, 461 F. Supp. 3d 747, 760 (E.D. Tenn. 2020) (violent sexual offender against children); *Doe v. Rausch*, 382 F. Supp. 3d 783, 795 (E.D. Tenn. 2019) (offender against children).

Plaintiff is, therefore, unlikely to succeed in demonstrating by the clearest proof that the Act is "so punitive in either purpose or effect as to negate the State's intention" to establish civil regulations. *Seling*, 531 U.S. at 261.

**A.      The Act does not inflict what has been historically understood as punishment.**

The Act does not inflict punishment as understood in our history and traditions. Plaintiff argues that the Act resembles the traditional punishments of banishment, shaming, probation, and parole. (D.E. 13, PageID# 80-82.) But those traditional punishments are easily distinguishable from the civil regulations of the Act.

**1.      Residency restrictions are not equivalent to banishment.**

The Act's residency restrictions are markedly different from the traditional punishment of banishment. Banishment historically "involved the complete expulsion of an offender from a socio-political community" and "prohibited an offender from even being present in the jurisdiction." *Shaw v. Patton*, 823 F.3d 556, 566 (10th Cir. 2016). "Under the historic common law, banishment is equated to deportation." Beth Caldwell, *Banished for Life: Deportation of Juvenile Offenders as Cruel and Unusual Punishment*, 34 Cardozo L. Rev. 2261, 2302 (2013). Banishment completely removes an individual from a geographical area, and "the banished individual presumably retains *no* rights of membership in the community from which he/she was banished." William Garth Snider, *Banishment: The History of Its Use and a Proposal for its Abolition Under the First Amendment*, 24 New Eng. J. on Crim. & Civ. Confinement 455, 476 (1998). Blackstone described banishment as a "civil death," rendering the banished "absolutely dead in law" and "entirely cut off from society" the same way that a monk relinquishes his life upon entering a monastery. 1 William Blackstone, *Commentaries* 128.

Plaintiff cannot demonstrate that the Act's residency restrictions completely expel sexual offenders from the socio-political community of the State. Plaintiff claim that the Act resembles

6

banishment "because it restricts where offenders may live, work, or be present." (D.E. 13, PageID# 81.) That is not the equivalent of deporting sexual offenders from the State. The Act prohibits residence and employment only in specific locations within the State. It does not completely prohibit offenders from living in the State or in any particular county. Nor does it bar offenders from participating in the community.

The Act allows offenders to maintain their residence and employment, even if changes in the use of surrounding property would normally prohibit the offender from establishing a residence or employment at that location. Tenn. Code Ann. § 40-39-211(e). Rather than imposing "civil death" and complete expulsion from society, the Act imposes reasonable residency restrictions to protect vulnerable populations and limit opportunities for recidivism. *See Hope*, 9 F.4th at 531 (holding 1,000-foot residency restriction is not similar to banishment).

Plaintiff's only proof in support of his argument that the Act amounts to banishment comes from two sources. First, Plaintiff argues that this Court can take judicial notice of the number of parks, schools, childcare centers, and recreation areas in Nashville and thereby reach "the conclusion that [the Act] banishes offenders from vast swathes of every populated area in the State of Tennessee." (D.E. 13, PageID# 81.) Not only does that argument prejudge the issue by equating the residency restrictions with banishment, but it also flatly contradicts actual data on where sexual offenders live in Tennessee. For example, Davidson County's 2020 population of 715,844 makes up approximately 10.4% of the State's total population. Tennessee State Data Center, *2020 Population of Tennessee Counties and Incorporated Areas*, https://tnsdc.utk.edu/2021/08/12/2020-population-of-tennessee-counties-and-incorporated-areas/ (August 12, 2021). And the 1,418 registered sexual offenders living in Davidson County represent approximately 10.04% of all registered offenders residing in the State. (Ex. 1, Smitherman Dec.,

at ¶7(t).) The evidence—in contrast to Plaintiff's speculation—shows that sexual offenders are not banished from Tennessee's urban areas but instead choose to reside there at about the same rate[2] as the rest of the State's citizens.

Second, Plaintiff argues that this Court can take judicial notice of maps introduced in another case and conclude from those maps of Davidson County that the Act banishes sexual offenders. (D.E. 13, PageID# 81-82.) Judicial notice is not appropriate for such maps because they were developed for and offered as substantive evidence in another case. *Rogers v. Webstaurant Store, Inc.*, 774 F. App'x 278, 282 (6th Cir. 2019) ("A court *cannot* take notice of disputed court filings or disputed subjects in other cases."); *Neal*, 577 F. App'x at 452 n.11. Furthermore, this Court has already concluded that the maps of Davidson County are insufficient to support a claim that the Act is invalid on its face. *Doe #1 v. Lee* (*Does 1&2*), 518 F. Supp. 3d 1157, 1188 (M.D. Tenn. 2021). Sexual offenders live in all 95 counties of the State. (Ex. 1, Smitherman Dec., at ¶ 7.) Maps of Davidson County are not the "clearest proof" of the Act's effect across the State.

### 2. Publication of Plaintiff's name and offense is not equivalent to public shaming.

The Act's publication of vital information to the public is distinct from the historic punishment of public shaming. There were colonial punishments intended "to inflict public disgrace" and make offenders "suffer permanent stigmas, which in effect cast the person out of the community." *Smith*, 538 U.S. at 97-98 (quotation marks and citations omitted). But "[a]ny initial resemblance" of the Act to such punishments is "misleading." *Id.* at 98. Those historical

---

[2] Even if there were substantial differences between the rates at which offenders and citizens populated a county, that alone would not prove Plaintiff's claims. Because Plaintiff bears the burden of proving his case by the clearest proof, Plaintiff would have to demonstrate that those differences could not be explained by demographic factors unrelated to the Act's residency restrictions. *Seling*, 531 U.S. at 262.

punishments of public shaming "held the person up before his fellow citizens for face-to-face shaming." *Id.* The Act neither promotes face-to-face confrontations between the public and offenders nor seeks to humiliate the offender. In fact, every citizen who accesses the registry is informed that, by law, the information may not be used to inflict retribution on, harass, or threaten offenders. Tenn. Code Ann. § 40-39-201(8); Tenn. Bureau of Investigation, *Sex Offender Registry Search*, https://www.tn.gov/tbi/general-information/redirect-tennessee-sex-offender-registry-search/sex-offender-registry-search.html (last visited September 23, 2021). Instead of promoting "face-to-face shaming," the Act discourages confrontation and promotes public awareness. *Smith*, 538 U.S. at 98. Any stigma resulting from the publication of sexual offenders' information "results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public." *Id.*; *see id.* at 99 (holding that publication on the Internet "does not alter [this] conclusion").

Plaintiff alleges in his complaint that he is "stigmatize[d]" by having his information on the SOR and by the possibility that his peers, neighbors, and clients will discover his registry status. (D.E. 1, PageID# 13, ¶¶ 48-49.) But he appears to abandon this analogy to public shaming in his motion for a preliminary injunction, focusing instead on banishment and probation. (D.E. 13, PageID# 80-82.) Rightly so: the Supreme Court has already held that dissemination of information like that Plaintiff complains of is not equivalent to public shaming. *Smith*, 538 U.S. at 98-99.) Furthermore, unlike other Tennessee plaintiffs who have successfully challenged the Act, Plaintiff is not labeled a "violent sexual offender" or an "offender against children." *Cf. Does #1-2 v. Lee*, 518 F. Supp. 3d 1157, 1193-94 (M.D. Tenn. Feb. 8, 2021). Plaintiff cannot demonstrate by the clearest proof that the Act sanctions and facilitates face-to-face confrontations between offenders and the public with the intent to humiliate offenders.

9

### 3.  Reporting requirements are not equivalent to probation or parole.

The traditional punishments of probation and parole are different from the Act's reporting requirements in both character and effect.  Plaintiff cites the Act's reporting requirements, residency restrictions, and "criminal penalties for failure to comply" in support of his argument that the Act resembles probation and parole.  (D.E. 13, PageID# 82.)  Historically, probation and parole have involved far more comprehensive governmental intrusions into a probationer's affairs than the Act's reporting requirements.

The Act requires sexual offenders like Plaintiff to report annually and whenever an offender makes changes to his or her reportable information.  Tenn. Code Ann. §§ 40-39-203, -204(c).  In contrast, probationers are traditionally subject to the active supervision of a probation officer.  *Shaw*, 823 F.3d at 564; *see Smith*, 538 U.S. at 87 (noting that registrants, unlike probationers, have "no supervision" and "are not required to seek permission" before engaging in activities); Tenn. Code Ann. § 40-28-117(a)(1) (specifying that parolees "remain while thus on parole in the legal custody of the warden of the prison . . . until the expiration of parole").  The conditions of probation typically require probationers to accept the first offer of employment; obtain written consent from a probation officer before moving or changing jobs; meet family responsibilities; report monthly to the probation office; "avoid[] all evil associations," including abstaining from drugs and alcohol; submit to searches of person and property on no more than reasonable suspicion of a probation violation or criminal activity; submit to random drug tests; permit state agents to visit their homes; perform community service; undergo medical or psychiatric treatment; go on house arrest; use a transdermal monitoring device; make restitution to a victim; and sometimes serve time in a county jail.  *Shaw*, 823 F.3d at 565 & n.14 (quoting Lawrence M. Friedman, *Crime and Punishment in American History* 408 (1993)); *State v. Petersen-Beard*, 377 P.3d 1127, 1137 (Kan. 2016); *State v. Price*, 579 S.W.3d 332, 339-40 (Tenn.

10

2019) (listing the many conditions of probation); Tenn. Code Ann. §§ 40-28-117(a)(2), 40-35-303(d).

The Act requires none of these things. It does not require offenders to be employed. It does not require consent of law enforcement as a condition precedent to offenders moving or changing employment. *See* Tenn. Code Ann. § 40-39-211 (restricting offenders from living or working in protected areas but not requiring prior approval of the housing or employment situation). It does not regulate the offenders' responsibility to their families. *Id.* It does not require monthly reports. Tenn. Code Ann. § 40-39-203 (requiring violent sexual offenders to report only on a quarterly basis or within a specified time if certain information in the offenders' profiles changes). It does not restrict who an offender may befriend or what an offender may imbibe. It does not require offenders to submit to searches of person or property based on a reasonable suspicion; it does not even contain the word "search." Tenn. Code Ann. §§ 40-39-201 to -118. It does not require random drug tests, home visits, community service, medical or psychiatric treatment, transdermal monitoring devices, or restitution.

And while the Act is enforceable through criminal penalties, those penalties are a consequence distinct from Plaintiff's original offense—unlike the possibility that parole or probation may be revoked, which is tied to the underlying criminal punishment. *Smith*, 538 U.S. at 101-02 ("A sex offender who fails to comply with the reporting requirement may be subjected to criminal prosecution for that failure, but any prosecution [for violating a sex offender registry statute] is a proceeding separate from the individual's original offense."); *Hope*, 9 F.4th at 532; *Shaw*, 823 F.3d at 566.

As the only support for his argument that the Act is equivalent to parole, Plaintiff cites *Reid v. Lee*, No. 3:20-cv-00050, 2022 WL 1050645, at *16 (M.D. Tenn. Apr. 7, 2022). In that case, the

court held that the defendants could not distinguish Tennessee's Act from *Snyder* when it came to determining whether the registration requirements imposed on *violent* sexual offenders were equivalent to the traditional punishment of probation and parole. *Id.* But this case is directly distinguishable from *Snyder*. In *Snyder*, the plaintiffs were Tier III offenders who were required to register four times per year for the rest of their lives. *Snyder*, 834 F.3d at 703; *Does #1-4 v. Snyder*, 932 F. Supp. 2d 803, 816 (E.D. Mich. 2013) ("'A tier III offender shall report not earlier than the first day or later than the fifteenth day of each April, July, October, and January after the initial verification or registration.'" (quoting Mich. Comp. Laws § 28.725a(3) (2013))). Plaintiff must register once per year. (D.E. 1, PageID# 11, ¶ 42); Tenn. Code Ann. § 40-39-204(c). And he is eligible for termination of his registration requirements after five years. Tenn. Code Ann. § 40-39-207(i)(4)(B). The Act does not impose the typical supervisory conditions which permeate every aspect of a probationer's life. Plaintiff is unlikely to demonstrate otherwise.

### B. The Act does not impose an affirmative disability or restraint.

As to the second of the five ex post facto factors, the Act does not impose affirmative disabilities or restraints of a punitive nature. Plaintiff suggests that the Act's geographic restrictions and reporting requirements constitute direct restraints, essentially doubling down on his arguments about the Act resembling traditional punishments. (D.E. 13, PageID# 80.) But "[r]egistration requirements make a valid regulatory program effective and do not impose punitive restraints in violation of the *Ex Post Facto* Clause." *Smith*, 538 U.S. at 102. And the Supreme Court has held even onerous burdens—including fines, occupational disbarment, involuntary confinement, and denial of governmental benefits—will not transform a civil regulation into punishment. *Hope*, 9 F.4th at 532-33 (collecting Supreme Court cases). The reporting requirements and 1,000-foot restrictions imposed by the Act are not physical restraints or obligations so onerous that they approach imprisonment. *See id.* (holding a similar 1,000-foot

restriction did not impose an affirmative disability or restraint); *Vasquez v. Foxx*, 895 F.3d 515, 522 (7th Cir. 2018) (upholding similar 500-foot restrictions); *Shaw*, 823 F.3d at 568, 570-71 (upholding similar 2,000-foot restrictions).  Plaintiff is unlikely to demonstrate by clear proof that the Act's requirements are significantly more akin to imprisonment than restrictions already upheld by the Supreme Court.

### C.    The Act is not intended to promote the traditional aims of punishment.

Regarding the third factor, the Act is designed to promote the legislature's civil regulatory interest in public safety.  Any collateral effects that may resemble the aims of punishment are not sufficient to deem it *punitive* in effect.  Criminal punishment has traditionally been founded on retribution, but it may also be expected to deter future crime, rehabilitate criminals, and, in some cases, incapacitate criminals.  *Ewing v. California*, 538 U.S. 11, 25 (2003).  The obvious aim of the Act is to protect and inform Tennesseans to promote public safety.  Tenn. Code Ann. § 40-39-201.  While the Act may have a collateral deterrent effect on crime, such collateral effects will not render sex offender registration laws punitive.  *Smith*, 538 U.S. at 102; *see also Snyder*, 834 F.3d at 704 (noting courts "give this factor little weight" because of the overlap between civil and punitive purposes).  This is especially true when, as is the case here, the effects of the Act are "non-permanen[t]." *Jackson v. Rausch*, No. 3:19-cv-377, 2021 WL 4302769, at *8, 10 (E.D. Tenn. Sept. 21, 2021) (concluding the Act's was not punitive in effect regarding plaintiff); *see also Doe v. Rausch*, 461 F.Supp.3d 747, 767 (E.D. Tenn. May 14, 2020) (contrasting lifetime registration with ten years of registration); *cf. Doe #1 v. Lee, et al.*, 518 F.Supp.3d 1157, 1181 n.19 (M.D. Tenn. Feb. 8, 2022) (finding that the duration of lifetime compliance was relevant to the nature and effects of the Act on plaintiffs).  The Act's collateral deterrent effects do not make it punitive.

13

### D. The Act is rationally connected to a non-punitive purpose.

With respect to the fourth factor, the Act is rationally related to the State's non-punitive interest in public safety. This factor is "[m]ost significant" to this Court's determination of whether the Act is punitive. *Smith*, 538 U.S. at 102 (quoting *United States v. Ursery*, 518 U.S. 267, 290, (1996)). [3] The Supreme Court has held that sex offender registration laws are rationally connected to the State's interest in public safety. *Smith*, 538 U.S. at 103. Multiple other courts have held that sex offender registration acts are rationally related to the governmental interest in public safety. *See*, *e.g.*, *Hope*, 9 F.4th at 533-34; *Shaw*, 823 F.3d at 573-75. The General Assembly has found that violent sexual offenders "present an extreme threat to public safety" and that "[s]exual offenders pose a high risk of engaging in further offenses." Tenn. Code Ann. § 40-39-201(b)(1). "[P]rotection of the public from these offenders is of paramount public interest," and it is necessary that the public have information about offenders "to adequately protect themselves and their children from these persons." Tenn. Code Ann. § 40-39-201(b)(1) – (2).

Plaintiff assumes for present purposes that the Act "has a non-punitive purpose of preventing future acts of sexual violence" but argues "there is no evidence" that the "burdens [of the Act] prevent sexual violence." (D.E. 13, PageID# 83.) "A statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Smith*, 538 U.S. at 103. Instead, Plaintiff bears the burden of demonstrating "that the Act's nonpunitive purpose is a 'sham or mere pretext.'" *Id.* (quoting *Hendricks*, 521 U.S. at 371 (Kennedy, J., concurring)).

---

[3] A court in this district has previously assumed that the defending public official bears the burden of proof on this factor because the defending public official would bear the burden of proof in an as-applied First Amendment challenge. *Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1202 (M.D. Tenn. 2021). But due to the quasi-facial nature of an as-applied ex post facto challenge like this one, the party challenging the statute bears the burden of proof. *See Seling*, 531 U.S. at 261. This burden does not shift for factor four. *See id.*

14

The State's legitimate interest in public safety is more than a "sham or mere pretext." The Supreme Court, the Sixth Circuit, and other courts have recognized that it is a legislature's prerogative to conclude that sexual offenders pose a risk to public safety. *Smith*, 538 U.S. at 103; *Hope*, 9 F.4th at 534; *Shaw*, 823 F.3d at 575-77; *Petersen-Beard*, 377 P.3d at 1139-40; *Doe v. Bredesen*, 507 F.3d 998, 1007 (6th Cir. 2007) ("[O]ur role is not to invalidate the program if the Tennessee Legislature has not struck the perfect balance between the regulatory purpose of the program and its burdens on Tennessee citizens . . . .").

Moreover, Plaintiff's reliance on a lack of evidence has the burden allocation exactly backward. Again, it is Plaintiff's burden to demonstrate by clearest proof that Tennessee's interest in public safety is a sham or pretext. *Smith*, 538 U.S. at 103. Plaintiff has not identified any evidence he intends to present to make this showing. Plaintiff is unlikely to succeed on this most significant factor. *Smith*, 538 U.S. at 102.

**E.     The Act is not excessive in relation to its purpose.**

The Act imposes reasonable reporting requirements, residency restrictions, and restrictions on overnight visits to serve the legislature's interest in public safety; it is not excessive in relation to its non-punitive purpose. "The excessiveness inquiry of our *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105.

Plaintiff has not demonstrated he is likely to meet his burden to show the Act is unreasonable in light of its nonpunitive objective. Plaintiff effectively admits that the Act's regulations may prevent recidivism by some offenders but claims the Act is burdensome with respect to other offenders. (D.E. 13, PageID# 84.) This amounts to little more than a complaint about tailoring, which the Supreme Court has already rejected. *Smith*, 538 U.S. at 103 ("The *Ex*

15

*Post Facto* Clause does not preclude a State from making reasonable categorical judgments . . . ."); *see Arthur v. United States*, 253 A.3d 134, 143 (D.C. 2021). (finding an offender bringing a facial ex post facto challenge must show the "in-person verification requirement is punitive and excessive 'in all its applications'" (quoting *Tilley v. United States*, 238 A.3d 961, 969 (D.C. 2020))).

Plaintiff's argument also fails to account for the burden that sexual offenses impose on the public. Even considering only the monetary aspect of this burden, the costs of sexual offenses are very high. Medical expenses for sexual assaults in the United States cost approximately $482,910,000.00 in 2019 alone. *See* Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, *WISQARS: Cost of Injury Data*, https://wisqars.cdc.gov/cost/?y=2019&o=HOSP&i=4&m=3000&g=00&s=1&s=2&s=3&u=TOTAL &u=AVG&t=COMBO&t=MED&t=LIFE&t=WORK&a=5Yr&g1=0&g2=199&a1=0&a2=199&r1= MECH&r2=INTENT&c1=NONE&c2=NONE (last accessed May 13, 2022). A 2017 study found that "[t]he present-value, per-victim estimated lifetime cost of rape was $122,461, or $3.1 trillion for all victims, based on 23 million U.S. women and 2 million men with lifetime experience of rape" and that "[g]overnment sources pay an estimated $1 trillion (32%) of the total lifetime economic burden" of rape. Cora Peterson, Sarah DeGue, Curtis Florence, & Colby N. Lokey, *Lifetime Economic Burden of Rape Among U.S. Adults*, Am J Prev Med. 52(6):691-701 (June 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5438753/pdf/nihms849041.pdf. The State has an intense interest in mitigating the economic and noneconomic costs of such crimes.

Similarly, the Act's housing and employment restrictions and its provisions designed to maintain distance between offenders and certain protected public areas are eminently reasonable. As shown in the excerpted chart below, data from the Department of Justice Bureau of Justice Statistics reflects that in 2019, children in Tennessee "ages 14 to 17 experienced the highest rate

16

of sexual assault victimization, compared to other age groups" — at "a rate 4 times the overall rate for Tennessee" — and that many of the protected areas in the Act, including schools, daycares, and outdoor public locations fall within the categories accounting for the vast majority of locations of sexual assaults in Tennessee not committed in a home or a hotel.  U.S. Department of Justice, Bureau of Justice Statistics, *Sexual Assaults Recorded by Law Enforcement, 2019*, at 11, 13 (July 2021)  https://bjs.ojp.gov/sites/g/files/xyckuh236/files/sarble/sarble19/data/pdfs/sarble19_TN.pdf (last accessed May 12, 2022).



The majority of sexual assaults were committed in a private location, such as a residence or hotel, regardless of the time of day during which the incident occurred.

**Sexual assault victimizations, by location type and incident time of day, Tennessee, 2019**
*Hover over circles for more detail.*

*Circle size represents the percent of the total number of sexual assault victimizations that occurred at the indicated incident hour and location type.*

Note: Excludes 76 sexual assault victimizations for which incident hour is unknown and 195 sexual assault victimizations for which location type is unknown. See *Methodology* for description of data transformations to values for incident time of day and for location type.
Source: Bureau of Justice Statistics, based on data from the Federal Bureau of Investigation, National Incident-Based Reporting System, 2019.

That the Act prohibits an offender whose own child was his victim from residing or visiting overnight with his children is also not excessive.  The data in the chart above supports the General Assembly's strong interest in protecting children from sexual assault in residences by prohibiting overnight residence or visitation with a minor by sexual offenders.  Tenn. Code Ann. § 211(c).

The risk of sexual assault is pronounced in residences, and that risk continues to be high into evening hours at residences, unlike some locations where risk decreases after working hours. The prohibition on residing with a minor—including prohibiting a parent of a minor from residing with that minor if the offender's victim was a child of the offender—has been a component of the Act since its 2004 amendment. 2004 Tenn. Pub. Acts, ch. 921, § 1. Versions of the Act containing that prohibition have been upheld as a whole against an ex post facto challenge, *see Bredesen*, 507 F.3d at 1007, and the prohibition specifically has been upheld against constitutional challenge, *State v. Driver*, No. W2014-01152-CCA-R3-CD, 2015 WL 3397666, at *10 (Tenn. Crim. App. May 27, 2015) (no perm. app. filed).

This data is supported by the experience of officers tasked with implementing the Act. For example, Officer Henrietta Kerley has seen widespread community support of the Act as an asset for community awareness. (Ex. 2, Kerley Dec., at ¶ 6.) And, in her experience, the residential restrictions reduce crimes of opportunity by registered sexual offenders. (*Id.* at ¶ 7.) Officer Kerley believes the Act makes her community safer. (Ex. 2, Kerley Dec., at ¶ 8.)

The regulations imposed by the Act are reasonable in light of the threat to public safety posed by sexual offenders. Consideration of this factor along with all of the other pertinent factors leads to the conclusion that the Act is not so punitive in effect as to negate the legislature's intent to enact a civil law. "[N]o prior court has determined that five years [on the registry] is excessive to the point of being punitive." *Jackson*, 2021 WL 4302769, at *10. Plaintiff is, accordingly, unlikely to succeed on the merits of his case.

## III.  Plaintiff Has Not Demonstrated He Will Suffer Irreparable Harm.

The second factor of the preliminary injunction test—irreparable injury—weighs against injunctive relief. Plaintiff argues that, because the loss of a constitutional right constitutes an irreparable injury, he will suffer an irreparable injury if a preliminary injunction is not granted.

18

(D.E. 13, PageID# 85.) However, a finding of irreparable injury is only mandated *if* Plaintiff shows a significant possibility that he will succeed on the merits of his claims that his constitutional rights are being impaired. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). As discussed above, Plaintiff is unlikely to succeed on the merits. He is not experiencing the deprivation of a constitutional right and, thus, should not benefit from a presumption of irreparable injury.

Furthermore, Plaintiff has not demonstrated irreparable harm will result from the Act's continued enforcement during the pendency of litigation. Preliminary injunctions exist to protect "a right about to be destroyed, irreparably injured, or great and lasting injury about to be done." *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972) (quoting 3 Barron & Holtzoff, Federal Practice and Procedure (Wright Ed.) § 1431). Irreparable injury "'must be both certain and immediate,' not 'speculative or theoretical.'" *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (quoting *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019)).

Whatever burden is imposed by the restrictions on Plaintiff's contact with children, it does not justify the extraordinary remedy of enjoining enforcement of the entire Act. A court granting a preliminary injunction must fashion "injunctive relief tailored to the identified harm." *Northeast Ohio Coalition for Homeless v. Husted*, 696 F.3d 580, 599 (6th Cir. 2012); *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015). Beyond the generalized allegation of a violation of his constitutional rights, the only irreparable harm alleged by Plaintiff is the restriction on his attendance at church and overnight residence in a house with minor children. (D.E. 13, PageID# 85-86.) Plaintiff's request for an injunction that prohibits Defendants from enforcing the entire Act against him and requires removal of his information from the SOR (D.E. 12, PageID# 58) is unsupported by evidence that he suffers irreparable harm from the Act as a whole. Plaintiff's

requested relief is not tailored to the identified harm. *See Doe v. Rausch*, 461 F. Supp. 3d at 778-79 (refusing to order immediate removal from the SOR despite finding that lifetime registration was punitive because removal could be sought through administrative procedure); *Doe v. Rausch*, 382 F. Supp. 3d at 802 (same).

## IV.    The Balance of Equities Weighs Heavily Against Removing Plaintiff from the Sex Offender Registry.

The third and fourth preliminary injunction factors—harm to others and the public interest—also weigh heavily against an injunction. *Nashville Cmty. Bail Fund v. Gentry*, 446 F. Supp. 3d 282, 304–05 (M.D. Tenn. 2020) (noting these elements "merge when the Government is the opposing party" (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009))).

The staggering financial cost of sexual offenses, discussed in Section II.E. above, demonstrates the significant public interest in continued enforcement of the Act. And such analysis cannot begin to encompass the unquantifiable, non-monetary costs of sexual offenses— the immense pain and suffering which such offenses cause the victims and their families.

The public interest in preventing future acts of sexual violence also weighs against an injunction. *See* Tenn. Code Ann. § 40-39-201. The makes information about persons convicted of sexual offenses available to the public. *See* Tenn. Code Ann. § 40-39-203, -217. Importantly, the Act does not simply release identifying information about offenders; rather, it disseminates accurate information about the specific crime(s) committed by offenders, and the particular classifications of offenders. This information empowers members of the public to decide for themselves if they are comfortable interacting with people who pose a risk of recidivism and if they so choose, to take precautions to protect themselves, their children, and their families.

Local law enforcement officers report that they field numerous calls from citizens requesting information related to the registry, and that this access to information furthers public

20

safety. (Ex. 2, Kerley Dec., at ¶ 6.) This information helps people make informed decisions such as whether to move to a particular area. (Ex. 2, Kerley Dec., at ¶ 6.) According to Officer Kerley, the local community in Cumberland County "loves having the ability to check" whether offenders live in their neighborhoods, and the Cumberland County Sheriff's Office "constantly" receives praise from local citizens for its efforts to keep the community safe. (Ex. 2, Kerley Dec., at ¶ 6.) As Kerley explains, in her opinion, "[c]ommunity awareness . . . is a great asset in keeping our citizens safe." (Ex. 2, Kerley Dec., at ¶ 6.)

The Act also prevents future acts of sexual violence by directly and indirectly placing distance between convicted offenders and vulnerable minors. *See supra* Part II, Section E (describing the intersection between the Act's protected areas and likely victims). Hence, the Act's 1,000-foot restrictions reduce the opportunity for offenders to recidivate by limiting their contact with potential victims in the places where offenders are more likely to reoffend. Based on her experience, Officer Kerley concurs with this strategy: "I absolutely believe there is a reduction in crime because sex offenders are required to register. I believe that some offenders are opportunist. When an offender knows they are required to register, have periodic residential verification, and laws to abide by that are enforced it narrows opportunity for the offender." (Ex. 4, Kerley Dec., at ¶ 7.)

The Act prevents future acts of sexual violence by providing law enforcement with accurate registration information about offenders in their area. (*Id.* at ¶ 5.) These features also assist law enforcement investigations when offenders do recidivate or are suspected of recidivism. For instance, law enforcement reports that the availability of the registry may help give investigating officers insight into an offender's modus operandi. (*Id.*)

The features of the Act are no less applicable to Plaintiff than they are to every other sex offender to whom the Act applies. Granting this preliminary injunctive relief would cause substantial harm to the public and to Defendants' ability to protect the public because, once Plaintiff is removed from the registry, other members of the public will no longer be able to make informed decisions about the type and extent of contact they and their minor loved ones will have with this sexual offender. The guardrails against reoffending of geographic restrictions and law enforcement surveillance will be removed. While Plaintiff argues that the public interest is served by preventing the violation of constitutional rights, as noted above, Plaintiff's constitutional rights are not being violated. Rather, the interest of the public and the government in this case lies in ensuring the Act continues to protect and inform the residents of Tennessee.

## CONCLUSION

For these reasons, Doe #11's request for injunctive relief should be denied.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

s/ *Rob Mitchell*
ROB MITCHELL
Senior Assistant Attorney General
B.P.R. No. 32266
CODY N. BRANDON
Assistant Attorney General
B.P.R. No. 37504
MIRANDA H. JONES
Assistant Attorney General
B.P.R. No. 36070
Law Enforcement and Special
Prosecutions Division
Office of the Tennessee
Attorney General and Reporter
P.O. Box 20207

22

Nashville, Tennessee 37202-0207
Off. (615) 532-6023
Fax (615) 532-4892
Robert.Mitchell@ag.tn.gov
Cody.Brandon@ag.tn.gov
Miranda.Jones@ag.tn.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing has been filed and served electronically to the following parties via the Court's electronic filing system on this the 16th day of May, 2022:

    Edward M. Yarbrough
    Jonathan P. Farmer
    W. Justin Adams
    SPENCER FANE LLP
    511 Union Street, Suite 1000
    Nashville, Tennessee 37219
    eyarbrough@spencerfane.com
    jfarmer@spencerfane.com
    wjadams@spencerfane.com

                    *s/ Rob Mitchell*_____
                    ROB MITCHELL