IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHN DOE #11,                )
                                   )
       Plaintiff,            )
                                     )      NO. 3:22-cv-00338
v.                                      )      JUDGE RICHARDSON
                                     )
WILLIAM B. LEE, et al.,        )
                                     )
       Defendants.       )
                                     )

## **MEMORANDUM OPINION**

### INTRODUCTION

The Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act of 2004 ("SORA" or the "Act"), Tenn. Code Ann. §§ 40-39-201 to -218, requires an individual convicted of a qualifying offense ("Registrant") to register for inclusion in a database maintained by the Tennessee Bureau of Investigation ("TBI"). Under SORA, a Registrant is subject to a number of requirements. Chief among them, a Registrant is prohibited from residing or working within 1,000 feet of many common facilities where children are likely to be present, including schools, day care centers, and public parks and athletic fields. *Id.* § 40-39-211(a). The Registrant must also report in person to a designated law enforcement agency at prescribed intervals, *id.* § 40-39-204(b), (c), including within forty-eight hours of certain triggering events, such as a change of residence or employment, *id.* § 40-39-203(a). And the Registrant's status as a sexual offender, along with a laundry list of information about the individual, is made publicly available. *Id.* § 40-39-206(d). A violation of the Act's requirements is a Class E felony. *Id.* §§ 40-39-208(b), 40-39-211(f).

Several years ago, the Sixth Circuit concluded that Michigan's Sex Offender Registration Act—which similarly restricts registered offenders from living, working, or "loitering" within 1,000 feet of a school, and requires all registrants to appear in person "immediately" to update information such as new vehicles or "internet identifiers"—violates the U.S. Constitution's Ex Post Facto Clause to the extent that it punishes persons for offenses committed before the statute's enactment. *Does #1–5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016).

Due to the obvious similarities between the Michigan statute and Tennessee's Act, *Snyder* unleashed a flood of litigation regarding the constitutionality of Tennessee's SORA under the Ex Post Facto Clause. *See, e.g.*, *Jordan v. Lee*, No. 19-cv-00907, 2022 WL 1196980 (M.D. Tenn. Apr. 21, 2022) (Trauger, J.); *Reid v. Lee*, —F. Supp. 3d—, 2022 WL 1050645 (M.D. Tenn. Apr. 7, 2022) (Trauger, J.) ("*Reid II*"); *Does #1–9 v. Lee*, —F. Supp. 3d—, 2021 WL 5761039 (M.D. Tenn. Dec. 3, 2021) (Trauger, J.); *Doe v. Lee*, No. 21-cv-00028, 2021 WL 1907813 (M.D. Tenn. May 12, 2021) (Trauger, J.); *Doe #1 v. Lee*, 518 F. Supp. 3d 1157 (M.D. Tenn. 2021) (Richardson, J.); *Jackson v. Rausch*, No. 19-cv-377, 2020 WL 7496528 (E.D. Tenn. Dec. 21, 2020) (Jordan, J.); *Reid v. Lee*, 476 F. Supp. 3d 684 (M.D. Tenn. 2020) (Trauger, J.) ("*Reid I*"); *Doe v. Rausch*, 461 F. Supp. 3d 747 (E.D. Tenn. 2020) (Reeves, C.J.); *Doe v. Rausch*, 382 F. Supp. 3d 783 (E.D. Tenn. 2019) (Phillips, J.).

In this case, Plaintiff John Doe #11,[1] a Registrant due to a 2002 conviction for second-degree criminal sexual conduct committed against his 14-year-old stepchild, alleges that subjecting

---

[1] Plaintiff has filed a Motion to Proceed Under Pseudonym and for Protective Order, along with a Memorandum in Support. (Doc. Nos. 10, 11). Defendants have filed a response (Doc. No. 28) and Plaintiff has filed a Reply (Doc. No. 34). That motion remains pending and the Court will not address it herein. Accordingly, the Court will refer to Plaintiff using the pseudonym "John Doe #11" in this opinion, pending a ruling on his request to proceed under that pseudonym. Although Plaintiff is the only plaintiff in this case, he has designated himself as "John Doe #11" in the hope that the Court would grant his Motion to Deem Cases Related, Reassign, and Consolidate (Doc.

him to SORA's requirements violates the Ex Post Facto Clause.[2] Pending before the Court is Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 12, the "Motion"), to which Defendants—Governor William B. Lee and TBI Director David B. Rausch (collectively, "Defendants")—have filed a joint Response (Doc. No. 23), and Plaintiff has filed a Reply (Doc. No. 25). For the reasons that follow, Plaintiff's Motion will be **GRANTED IN PART** and **DENIED IN PART**.[3]

---

No. 8), which asks that this case be consolidated with another case pending before this Court, *Does #1–10*, No. 21-cv-00590. Although the Court has denied that motion (Doc. No. 24), the Court will retain the current case caption for purposes of this opinion. The recent proliferation of litigation challenging SORA's constitutionality has resulted in numerous cases with similar names. *Compare, e.g.*, *Doe v. Lee*, No. 21-cv-00028, 2021 WL 1907813 (M.D. Tenn. May 12, 2021), *with Doe v. Lee*, No. 21-cv-010, 2022 WL 452454 (E.D. Tenn. Feb. 14, 2022). In the interest of reducing future confusion for parties citing and referring to this case, the Court finds that for now it should continue as "Doe #11," notwithstanding that there are no Does #1–10 in this case.

[2] The U.S. Constitution contains two clauses commonly referred to as an "ex post facto" clause: one applicable to the States (U.S. Const. art. I, § 10, cl. 1), and one applicable to the federal government (U.S. Const. art. I, § 9, cl. 3). Because this case involves a state law (SORA), the Court's references herein are exclusively to the ex post facto clause applicable to the States, which the Court herein will call "the Ex Post Facto Clause."

[3] As explained below, the Court will grant Plaintiff's Motion to the extent that it seeks a preliminary injunction prohibiting Defendants from enforcing SORA, Tenn. Code Ann. § 40-39-201 to -218, against Plaintiff. However, the Court will deny Plaintiff's Motion insofar as it seeks an order (i) requiring removal of Plaintiff's information from the sex offender registry ("SOR"), and (ii) prohibiting Defendants from publishing Plaintiff's information on the SOR. Therefore, Defendants will *not* be required to remove Plaintiff's information from the SOR, and will *not* be prohibited from publishing Plaintiff's information on the SOR pursuant to Tenn. Code Ann. § 40-39-206(d).

In light of the Court's resolution of Plaintiff's request for a preliminary injunction explained herein, Plaintiff's alternative request for a temporary restraining order seeking the same relief will be denied as moot. *See SEC v. Torchia*, 183 F. Supp. 3d 1291, 1324 n.40 (N.D. Ga. 2016) ("Because the Court grants the [plaintiff]'s Preliminary Injunction Motion, it denies as moot the [plaintiff]'s TRO Motion.").

The Court finds that it is appropriate in this case to grant a preliminary injunction without an evidentiary hearing. Neither side has requested an evidentiary hearing and, as explained more fully herein, this Motion turns on the pure legal question of whether the retroactive provisions of SORA are punitive on their face, not on any factual dispute. Under these circumstances, an evidentiary hearing would be unnecessary. *See Certified Restoration Dry Cleaning Network, LLC*

## BACKGROUND

### A.  Tennessee's Adoption and Amendment of Sexual Offender Registration Statutes

This Court has previously provided a detailed account of the history of Tennessee's adoption and amendment of its sexual offender registration statutes. *See Doe #1*, 518 F. Supp. 3d at 1167–70; *see also Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *2–7 (recounting SORA's history and major provisions). The Court will not provide that full history here, but instead will provide only the details necessary to understand the instant dispute.

Tennessee did not have a sex offender registration law prior to 1994.[4] In that year, Tennessee enacted the predecessor statute to the current SORA, known as the Sexual Offender Registration and Monitoring Act ("SORMA"). 1994 Tenn. Pub. Acts, ch. 976. SORMA required any individual convicted of a qualifying offense ("SORMA registrant") to register with the TBI within ten days of release without supervision from probation, parole, or incarceration. *Id.* § 4. SORMA did not require in-person registration or reporting; instead, SORMA registrants were required to register and periodically update their information with the TBI by completing and

---

*v. Tenke Corp.*, 511 F.3d 535, 552–53 (6th Cir. 2007) (holding that a preliminary injunction hearing is required only "when there are disputed factual issues, and not when the issues are primarily questions of law").

[4] Sex offender registration statutes proliferated throughout the United States beginning in 1994, following Congress's passage of the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act (formerly codified at 42 U.S.C. § 14071, but since superseded by the Adam Walsh Child Protection and Safety Act of 2006, 34 U.S.C. § 20901 *et seq.*). The Wetterling Act conditioned "certain federal law enforcement funding on the States' adoption of sex offender registration laws and set[] minimum standards for state programs." *Smith v. Doe*, 538 U.S. 84, 89–90 (2003); *see also Ward v. State*, 315 S.W.3d 461, 467–68 (Tenn. 2010). The state laws adopted in the wake of the Wetterling Act are today often referred to as "Megan's Laws," in remembrance of Megan Kanka, a 7-year-old New Jersey girl who was sexually assaulted and murdered in 1994 by a neighbor with prior convictions for sex offenses against children. "By 1996, every State, the District of Columbia, and the Federal Government had enacted some variation of Megan's Law." *Smith*, 538 U.S. at 90.

returning paper forms. *Id.* §§ 4, 5. The information in the SORMA registry was expressly designated as confidential, with the exception that the TBI or a local law enforcement agency could "release relevant information deemed necessary to protect the public concerning a specific sexual offender." *Id.* § 7(c).

In the decade that followed, the General Assembly repeatedly amended SORMA to expand its scope, increase its reporting requirements, and reduce the level of confidentiality of registry information. For example, in 1997, the General Assembly amended SORMA to provide that, for all qualifying offenses committed on or after July 1, 1997, certain information concerning a SORMA Registrant "shall be considered public information" and made available online by the TBI. 1997 Pub. Acts, ch. 461, § 2. However, until 2003, SORMA did not expressly restrict where a SORMA registrant could live, work, or travel. In 2003, the General Assembly enacted legislation prohibiting a SORMA registrant from knowingly: (i) establishing a residence or accepting employment within 1,000 feet of a school, a child care facility, or the home of the SORMA Registrant's victim or the victim's immediate family member; (ii) coming within 100 feet of the victim; (iii) establishing a residence or other living accommodation with a minor who was not the SORMA registrant's own child; or (iv) establishing a residence with the SORMA registrant's own minor child, if any child of the SORMA registrant had been the SORMA registrant's victim or if the SORMA registrant's parental rights had been or were being terminated. 2003 Tenn. Pub. Acts, ch. 95, § 1.

In 2004, the Tennessee General Assembly repealed SORMA and replaced it with SORA, which remains, in amended form, in effect today. 2004 Tenn. Pub. Acts, ch. 921.[5] The Act's major requirements can be classified in five categories:

1.      *Providing and updating information*. A Registrant must provide a laundry list of information under penalty of perjury, including (but not limited to) the Registrant's name, address, date and place of birth, social security number, information about the Registrant's offense(s) of conviction, copies of the Registrant's driver license and passports, and a "complete listing of the [Registrant]'s electronic mail address information, including usernames, any social media accounts the [Registrant] uses or intends to use, instant message, other internet communication platforms or devices, and the [Registrant]'s username, screen name, or other method by which the [Registrant] accesses these accounts or websites." *See* Tenn. Code Ann. § 40-39-203(i). In contrast to SORMA's system of TBI-propagated forms, the Act requires a Registrant to register in person with the designated law enforcement agency. *Id.* § 40-39-203(a), (c). The Registrant must report in person with the appropriate law enforcement agency within 48 hours of "establishing or changing a primary or secondary residence, establishing a physical presence at a particular location, becoming employed or practicing a vocation or becoming a student in this state." *Id.* § 40-39-203(a)(1). A Registrant must also report within 48 hours any "change in any other information given to the registering agency by the [Registrant] that is contained on the registration form," or any "material change in employment or vocation status." *Id.* § 40-39-203(a)(4), (a)(6). The Registrant has "three (3) days, excluding holidays" to report any change in his "electronic mail address information, any instant message, chat or other internet communication name." *Id.*

---

[5] Like SORMA, the Act has been revised repeatedly to impose additional restrictions and requirements and to make more information about Registrants publicly available. *See Doe #1*, 518 F. Supp. 3d at 1170 (cataloging amendments from 2005 to 2015).

§ 40-39-203(a)(7). The Act also requires that the Registrant's DNA sample be taken and sent to the TBI. *Id.* § 40-39-203(n).

2.  *Periodic in-person reporting.* Under the Act, each Registrant is classified as either a "violent sexual offender" or a "sexual offender," depending on the Registrant's offense(s) of conviction.[6] *Compare id.* § 40-39-202(31) (listing "violent sexual offenses"), *with id.* § 40-39-202(20) (listing "sexual offenses"). A Registrant classified as a violent sexual offender must report in person to the designated law enforcement agency four times per year (once in March, June, September, and December of each calendar year) to update the Registrant's fingerprints, palm prints, and photograph, and to verify the continued accuracy of the information in the registry. *Id.* § 40-39-204(b)(1). A Registrant classified as a sexual offender must report in person for these same purposes once a year. *Id.* § 40-39-204(c).[7]

3.  *Residence and work restrictions.* A Registrant may not "knowingly establish a primary or secondary residence or any other living accommodation or knowingly accept employment within one thousand feet (1,000′) of the property line of any public school, private or parochial school, licensed day care center, other child care facility, public park, playground, recreation center, or public athletic field available for use by the general public." *Id.* § 40-39-

---

[6] Most (but not all) of the offenses that require registration under SORA are offenses that contain an explicitly sexual element. For example, sexual battery and sexual exploitation of a minor, among other offenses, qualify as "sexual offenses," Tenn. Code Ann. § 40-39-202(20)(A)(i), (iv), whereas rape is a "violent sexual offense," *id.* § 40-39-202(31)(B). SORA classifies false imprisonment and kidnapping as "sexual offenses" if the victim was a minor (and the defendant was not the victim's parent), even though those offenses do not contain an expressly sexual element. *Id.* § 40-39-202(20)(A)(v), (vi).

[7] The distinction between a "sexual offender" and "violent sexual offender" is significant not only because of the corresponding differences in requirements and prohibitions for the two classes of Registrants, but also because generally a first-time "sexual offender" may petition the TBI to be removed from the registry after ten years, Tenn. Code Ann. § 40-39-207(a), (g)(2)(A), whereas a "violent sexual offender" must register for the remainder of his life, *id.* § 40-39-207(g)(2)(B).

211(a)(1). Moreover, if a Registrant's victim was a minor, the Registrant may not "knowingly reside or conduct an overnight visit at a residence in which a minor resides or is present." *Id.* § 40-39-211(c)(1). There is an exception to this latter prohibition if "the [Registrant] is the parent of the minor." *Id.* But this exception is, in turn, subject to exceptions of its own; that is, even if it otherwise would apply, the exception to the prohibition is inapplicable under certain circumstances, including when "[a]ny minor or adult child of the [Registrant] was a victim of a sexual offense or violent sexual offense committed by the [Registrant]." *Id.* § 40-39-211(c)(1)(B). Thus, SORA prohibits a Registrant who committed an offense against his own minor child from residing or conducting an overnight visit at any residence in which there is a minor—regardless of whether that minor is the Registrant's child.

4.    *Movement restrictions.* A Registrant cannot knowingly "[b]e upon or remain on the premises of any building or grounds of any public school, private or parochial school, licensed day care center, other child care facility, public park, playground, recreation center or public athletic field available for use by the general public in this state when the [Registrant] has reason to believe children under eighteen (18) years of age are present." *Id.* § 40-39-211(d)(1)(A). A Registrant also cannot knowingly "[s]tand, sit idly, whether or not the [Registrant] is in a vehicle, or remain within one thousand feet (1,000′) of" the facilities covered under § 40-39-211(d)(1)(A) "when children under eighteen (18) years of age are present, while not having a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there." *Id.* § 40-39-211(d)(1)(B).

5.    *Additional restrictions related to children.* A Registrant may not be "alone with" a minor in a "private area." *Id.* § 40-39-211(k)(2). SORA defines a "private area" as "any real or personal property, regardless of ownership, where the conduct of the [Registrant] is not readily

observable by anyone but the minor or minors alone with the [Registrant]," potentially including individual rooms of a building. *Id.* § 40-39-211(k)(1)(B). "Alone with" is defined to mean that the Registrant is in the presence of a minor in a "private area," and there is no other adult "present in the area" who is conscious and able and willing to come to the minor's aid. *Id.* § 40-39-211(k)(1)(A)(i). However, if the Registrant is in a private area "where the [Registrant] has the right to be," he is not "alone with" a minor if the Registrant is engaged in an "otherwise lawful activity" and the minor's presence is "incidental, accidental, or otherwise unrelated to the [Registrant]'s lawful activity." *Id.* § 40-39-211(k)(1)(A)(ii).

B. Facts Relating to Plaintiff[8]

In 2002, while living in Michigan, Plaintiff committed the offense of criminal sexual conduct, second degree, against his 14-year-old stepchild.[9] (Doc. No. 12-1 at ¶ 3). *See* Mich. Comp. Laws Ann. § 750.520c. Plaintiff pled guilty and served 42 months in prison. (Doc. No. 12-1 at ¶¶ 3–4). While in prison, Plaintiff underwent more than a year of sex offender therapy. (*Id.* at ¶ 4). He was ultimately released on parole. (*Id.*). He did not violate the terms of his parole and, in 2007, his sentence terminated. (*Id.*). Plaintiff initially registered as a sex offender under Michigan

---

[8] Unless otherwise noted, all facts in this section are drawn from the two declarations Plaintiff has submitted in support of his Motion (Doc. Nos. 12-1, 25-4), and have not been disputed by Defendants (at least for purposes of this Motion).

Plaintiff has filed redacted version of both declarations not under seal (Doc. Nos. 12-1, 25-4), along with unredacted versions and motions for leave to file the unredacted declarations under seal (Doc. Nos. 14, 26). The Court herein does not address the motions to seal the unredacted declarations, and those motions remain pending. Citations in this opinion will be to the publicly available versions of Plaintiff's redacted declarations.

[9] As discussed below, the only case-specific fact relevant to Plaintiff's ex post facto challenge is the date of his offense. The Court includes additional alleged facts in this section of the opinion not because they relate to the ex post facto analysis (which they do not), but instead because they (a) are relevant to factors of the preliminary injunction analysis other than likelihood of success on the merits, and/or (b) help place the parties' arguments in context.

law; however, he ceased registering in September 2019 after Michigan stopped enforcing its sex offender law against Plaintiff (and others) due to court rulings in federal litigation in that state. (*Id.* at ¶ 5).

A year later, in October 2020, Plaintiff moved to Tennessee and did not believe he was required to register as a sex offender under SORA. (*Id.* at ¶ 6). Plaintiff lived in Tennessee for more than a year (apparently without incident) until, in February 2022, he was arrested by the local law enforcement officer responsible for enforcing SORA in Plaintiff's county. (*Id.*). The district attorney general ultimately dismissed the charges against Plaintiff, but Plaintiff was required to register as a sex offender under SORA. (*Id.*).

Plaintiff's arresting officer informed Plaintiff that he may not attend his church—at which Plaintiff is a lay pastor and which his wife and children attend—because the church has a gymnasium. (*Id.* at ¶ 14).[10] Accordingly, Plaintiff avers that, since his February 2022 arrest, he has "been unable to attend church with [his] family or practice [his] ministry as a lay pastor on church grounds when children are present." (*Id.*). Plaintiff also states that he cannot go to parks or playgrounds with his minor children or attend their sporting events. (*Id.*).

Further, because the victim of Plaintiff's offense was his minor stepchild, the TBI has determined that Plaintiff is not permitted to live with his children. Under Tenn. Code Ann. § 40-39-211(c)(1), a Registrant whose victim was a minor is prohibited from "knowingly resid[ing] or conduct[ing] an overnight visit at a residence in which a minor resides or is present." Although

---

[10] Although not entirely clear from Plaintiff's declaration, the arresting officer's determination that Plaintiff may not attend his church appears to be based on Tenn. Code Ann. § 40-39-211(d)(1)(A), which prohibits a Registrant from being upon or remaining on "the premises of any building or grounds of any . . . playground, recreation center or public athletic field available for use by the general public in this state when the [Registrant] has reason to believe children under eighteen (18) years of age are present."

there is an exception "if the [Registrant] is the parent of the minor," *id.*, that exception does not apply when "[a]ny minor or adult child of the [Registrant] was a victim of a sexual offense or violent sexual offense committed by the [Registrant]," *id.* § 40-39-211(c)(1)(B). As a result, in April 2022, Plaintiff's arresting officer "ordered [Plaintiff] to get a hotel room and move out of [his] house immediately or he would arrest [Plaintiff]." (Doc. No. 12-1 at ¶ 15.) Since April, Plaintiff has thus spent each night in a hotel room and returned home in the morning. (*Id.*). The officer told Plaintiff that he must leave his home each night by 11:59 p.m. (Doc. No. 25-4 at ¶ 2.) Although the officer did not specify when Plaintiff may return, Plaintiff has been returning home each morning by 5:30 a.m., so far without incident. (*Id.*). Plaintiff avers that his practice has been to leave home around 10:00 p.m. each night, after which he drives about twenty-five minutes to the hotel his arresting officer has approved Plaintiff to stay in. (*Id.* at ¶ 3). Although there are hotels closer to Plaintiff's home, Plaintiff cannot stay in them because they are within 1,000 feet of parks and other SORA-prohibited areas. (*Id.*). Plaintiff avers that he is staying in the nearest, cheapest hotel at a cost of $130 per night. (*Id.*).

Further, Plaintiff avers that he "cannot safely be alone with [his] children at any time," (Doc. No. 12-1 at ¶ 17), because SORA prohibits him from being in the presence of any of his minor children in any "private area" (such as a room or car), Tenn. Code Ann. § 40-39-211(k)(2), unless (a) another conscious adult is present, or (b) his children's presence is "incidental, accidental, or otherwise unrelated to [Plaintiff's] lawful activity," *id.* § 40-39-211(k)(1)(A).

Plaintiff also canceled a family vacation to Florida after his arresting officer threatened to arrest Plaintiff if he spent the night with his children in Florida. (Doc. No. 12-1 at ¶ 16.).

The TBI currently classifies Plaintiff as a "sexual offender," not a "violent sexual offender," meaning that he is subject to only annual (as opposed to quarterly) reporting and is

eligible to apply for removal from the registry after a certain period of time (as opposed to being required to register for life). (*Id.* at ¶ 7). However, Plaintiff avers that his arresting officer told him that the officer had "lobbied hard" for the TBI to classify Plaintiff as a "violent sexual offender." (*Id.*). Consequently, Plaintiff "fear[s] that future TBI counsel may interpret SORA differently and re-classify [him] as a 'violent sexual offender.'" (*Id.*).

C. Procedural Background

On May 10, 2022, Plaintiff filed his Complaint for Declaratory and Injunctive Relief. (Doc. No. 1). Based on the facts described above, the Complaint asserts two counts, both under 42 U.S.C. § 1983, for alleged violations of the U.S. Constitution's Ex Post Facto Clause. Count 1 asserts a claim that SORA violates the Ex Post Facto Clause "as applied to pre-SORA offenses." (*Id.* at ¶¶ 72–76). Count 2 asserts a claim that SORA violates the Ex Post Facto Clause "as applied to Plaintiff." (*Id.* at ¶¶ 77–81).

On May 11, 2022, Plaintiff filed the instant Motion, along with a Memorandum in Support. (Doc. Nos. 12, 13). In the Motion, Plaintiff states that he seeks preliminary relief "only on Count 2 of the complaint, which claims SORA violates the Ex Post Facto Clause as applied to Plaintiff." (Doc. No. 12 at 1 n.1). Plaintiff requests a temporary restraining order and preliminary injunction (i) prohibiting Defendants from enforcing SORA against Plaintiff, including the continued publication of Plaintiff's information on the sex offender registry ("SOR"), and (ii) requiring Defendants to remove Plaintiff's information from the SOR. (*Id.* at 1). At the Court's direction, Defendants filed a Response in Opposition on May 16, 2022.[11] (Doc. No. 23). Plaintiff filed a reply on May 20, 2022 (Doc. No. 25), and the matter is now ripe for disposition.

---

[11] The Court recognizes and appreciates Defendants' counsel's compliance with the briefing schedule ordered by the Court.

<u>LEGAL STANDARD</u>

The Court considers four factors in deciding a motion for preliminary injunction[12] under Federal Rule of Civil Procedure 65: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to the opposing party or others; and (4) whether the public interest would be served by the issuance of the injunction. *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (citing *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Generally speaking, "district courts weigh the strength of the four factors against one another," in what is commonly described as a "balancing test." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). However, the inquiry is not a pure balancing test because the second factor—irreparable injury absent the injunction—*must* be present in order for the Court to issue the requested preliminary injunction. *Id.* at 326–27 (6th Cir. 2019) ("[E]ven the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.' That factor is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit.") (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Thus, "although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory." *Id.* at 327.

---

[12] As noted in footnote 3 *supra*, in light of the Court's resolution of Plaintiff's request for a preliminary injunction explained herein, Plaintiff's alternative request for a temporary restraining order seeking the same relief will be denied as moot. *See SEC v. Torchia*, 183 F. Supp. 3d 1291, 1324 n.40 (N.D. Ga. 2016) ("Because the Court grants the [plaintiff's] Preliminary Injunction Motion, it denies as moot the [plaintiff's] TRO Motion."). Accordingly, the Court will only discuss the legal standard for a preliminary injunction motion in this section.

"Furthermore, the first factor in many cases is not far from effectively being a prerequisite, inasmuch as 'a finding that there is simply no likelihood of success on the merits is usually fatal.'" *Carter v. Tenn. Dep't of Child.'s Servs.*, No. 22-cv-00247, 2022 WL 1144134, at *2 (M.D. Tenn. Apr. 18, 2022) (brackets omitted) (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)); *see Daunt*, 956 F.3d at 421 ("Our cases warn that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success.") (brackets omitted) (quoting *La.-Pac. Corp. v. James Hardie Bldg. Prods., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019)). Indeed, "[i]n constitutional cases, the first factor is typically dispositive," because when "constitutional rights are threatened or impaired, irreparable injury is presumed," and "no cognizable harm results from stopping unconstitutional conduct, so 'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (first quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012), and then quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)).

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012).

Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than "scant evidence" to substantiate their allegations. *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *McNeilly*, 684 F.3d at 614 (upholding denial of preliminary injunction when plaintiff made only a "small

showing" of evidence); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of Covid-19 in prisons); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, at *1 n.1 (6th Cir. Jan. 23, 1996) (affirming denial of a preliminary injunction where the district court relied on a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 06-cv-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice."). In conducting the preliminary injunction analysis, the Court is not limited to the four corners of the complaint but rather may rely on evidence, including affidavits and hearsay materials, which would not be admissible evidence for a permanent injunction if the evidence is appropriate given the character and objectives of the preliminary injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

Notably, the decision whether to grant a preliminary injunction is a matter within the discretion of the district court. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009).

<u>DISCUSSION</u>

A. <u>Substantial likelihood of success on the merits</u>

Before turning to the merits of Plaintiff's likelihood of success, it is necessary first to consider the distinction between a "facial" challenge and an "as-applied" challenge, and how that distinction applies to Plaintiff's ex post facto claim.

1. *Ex post facto challenges in relation to the "facial versus as-applied" dichotomy*

Constitutional challenges to statutes are often categorized as either "facial" or "as-applied." A "facial" challenge to a law's constitutionality has been described as "an effort to invalidate the law in each of its applications, to take the law off the books completely."[13] *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 691 (6th Cir. 2015) (quoting *Speet v. Schuette*, 726 F.3d 867, 871 (6th Cir. 2013)). To prevail on a "facial" challenge, a plaintiff must establish that "no set of circumstances exist under which the statute would be valid." *Id.* (brackets omitted) (quoting *Speet*, 726 F.3d at 872). An "as-applied" challenge, by contrast "argues that a law is unconstitutional as enforced against the plaintiffs before the court." *Id.* (quoting *Speet*, 726 F.3d at 872); *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a 'statute

---

[13] Although perhaps convenient shorthand, the commonly used metaphor of a successful facial challenge as acting to "take the law off the books" (or, similarly, "strike down" the law) is not technically an accurate description of how the judicial power or court judgments of unconstitutionality actually operate. *See, e.g.*, *Arizona v. Biden*, 31 F.4th 469, 483 (6th Cir. 2022) (Sutton, C.J., concurring) ("[W]e do not remove—'erase'—from legislative codes unconstitutional provisions. . . . We merely refuse to enforce them in a case, thereby exercising 'the negative power to disregard an unconstitutional enactment.'") (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1486 (2018) (Thomas, J., concurring) ("Invalidating a statute is not a 'remedy,' like an injunction, a declaration, or damages. . . . [C]ourts do not have the power to 'excise' or 'strike down' statutes."). When the Court herein quotes a case that uses such a description, the Court does not mean to suggest that the description is accurate.

may be invalid as applied to one state of facts and yet valid as applied to another.'") (quoting *Dahnke–Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)).

The major significance of the facial/as-applied distinction is that a facial challenge, if successful, will generally result in a much broader remedy and, consequently, requires a greater showing. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications. So classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy[.]'") (quoting *Citizens Utd. v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)). However, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens Utd.*, 558 U.S. at 331. And it is possible that a claim "can have characteristics of as-applied and facial challenges: it can challenge more than just the plaintiff's particular case without seeking to strike the law in all its applications." *Green Party of Tenn.*, 791 F.3d at 692 (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010)).

An ex post facto law has two features. First, it must be retroactive—that is, "it must apply to events occurring before its enactment." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (quoting *Weaver v. Graham*, 450 U.S. 24, 29 (1981)). Because the ex post facto prohibition is centrally concerned with fair notice, *see id.*, the relevant date for purposes of determining retroactivity is the date the offense was *committed*, not (for example) the date of conviction or sentencing. *Doe v. Bredesen*, 507 F.3d 998, 1003 (6th Cir. 2007) ("a law is retrospective if it changes the legal consequences of acts committed before its effective date") (quoting *United States v. Davis*, 397 F.3d 340, 347 (6th Cir. 2005)).

Second, an ex post facto law must be punitive (as opposed to civil): "the Constitution's ban on Ex Post Facto laws does not bar *all* retroactive lawmaking, but only retroactive punishment." *Does #1–5 v. Snyder*, 834 F.3d 696, 699 (6th. Cir. 2016); *see Kansas v. Hendricks*, 521 U.S. 346, 369 (1997) (holding that the Court's conclusion that the law at issue was "nonpunitive" removed "an essential prerequisite" for the ex post facto claim at issue).

Ex post facto claims are something of an awkward fit within the facial/as-applied dichotomy. In one sense, an ex post facto challenge can never truly be a facial challenge to the law at issue; because only *retroactive* applications are prohibited, even a punitive statute will never violate the Ex Post Facto Clause *as applied prospectively*. That is, an ex post facto challenge can never "invalidate the law in each [*i.e.*, all] of its applications," *Green Party of Tenn.*, 791 F.3d at 691, because (by definition) the Ex Post Facto Clause does not reach prospective applications.

In another sense, however, ex post facto challenges do resemble facial challenges. That is because the second element of an ex post facto claim—whether the challenged law is punitive— must be determined based on the face of the statue. *Seling v. Young*, 531 U.S. 250, 267 (2001). ("An Act, found to be civil, cannot be deemed punitive 'as applied' to a single individual in violation of the . . . *Ex Post Facto* Clauses . . . ."). The determination is not to be made based on any case-specific facts applicable only to the specific plaintiff at issue, except for the facts concerning when the plaintiff's offense was committed. *See State v. Letalien*, 985 A.2d 4, 17 (Me. 2009) ("The ex post facto prohibition is intended to act as a check on the exercise of legislative authority as it affects broad categories of persons, and is not intended to create an individual right to challenge a retroactive law based on the effect that the law has on each person's individual circumstances.").

In *Seling*, the Court considered whether a Washington state law authorizing the civil commitment of "sexually violent predators" violated the Ex Post Facto Clause. 531 U.S at 253. The case came to the Supreme Court on the assumption that the state law in question was "civil in nature," *id.* at 260, and the issue before the Court was thus only whether the plaintiff "could challenge the statute as being punitive 'as applied' to him," *id.* at 253, its generally civil nature notwithstanding. The Court held that the question of whether a statute is "civil" or "punitive" must be answered on the face of the statute, and that a facially civil statute cannot be rendered punitive "as applied" to the particular plaintiff. *Id.* at 263, 267. The Court explained that a prior decision, *Hudson v. United States*, 522 U.S. 93 (1997), had "expressly disapproved of evaluating the civil nature of an Act by reference to the effect that Act has on a single individual. Instead, courts must evaluate the question by reference to a variety of factors '"considered in relation to the statute on its face[.]"'" *Seling*, 531 U.S. at 262 (quoting *Hudson*, 522 U.S. at 100 (in turn quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169 (1963)). In support of its conclusion that a statute's punitive nature must be determined on its face, the *Seling* Court emphasized administrability concerns: allowing an individual plaintiff to challenge a facially civil statute as being punitive "as-applied" would be "unworkable," because "[s]uch an analysis would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity under the . . . *Ex Post Facto* Clauses." *Id.* at 263; *see also id.* ("The particular features of confinement may affect how a confinement scheme is evaluated to determine whether it is civil rather than punitive, but it remains no less true that the query must be answered definitively.").

Based on *Seling*, this Court has recognized in other cases challenging SORA that the protections of the Ex Post Facto Clause "do not depend on 'the effect that a challenged law has on

a single individual,' but rather the punitive nature of the 'statute on its face.'" *Does #1–9*, —F. Supp. 3d—, 2021 WL 5761039, at *3 (brackets omitted) (quoting *Seling*, 531 U.S. at 262); *accord Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *9 ("[T]he particularities of [plaintiff's] situation—aside from when he committed his offense—are of only limited importance to the merits of his *Ex Post Facto* Clause challenge.").[14] "As a result, the application of the Ex Post Facto Clause to a given situation can typically be ascertained simply by identifying the law at issue, placing the law in context, and piecing together the chronology of the law's adoption and the underlying criminal offense—without the need for a deep dive into any individual offender's circumstances." *Does #1–9*, —F. Supp. 3d—, 2021 WL 5761039, at *3. The Court agrees and

---

[14] Other courts agree. *See, e.g.*, *McGuire v. Strange*, 83 F. Supp. 3d 1231, 1250 n.17 (M.D. Ala. 2015) ("As-applied challenges in ex post facto cases are directly barred by *Seling*."); *Pittman v. Strange*, No. 12-cv-00667, 2014 WL 4685536, at * 4 (S.D. Ala. Sept. 22, 2014) ("The Supreme Court has flatly rejected the concept of an 'as-applied' *ex post facto* challenge to a civil statute.") (citing *Seling*); *Doe v. Biang*, 494 F. Supp. 2d 880, 887 n.7 (N.D. Ill. 2006) (stating that *Seling* "held that a plaintiff cannot mount an as-applied ex post facto challenge"); *People v. Tucker*, 879 N.W.2d 906, 911 n.4 (Mich. Ct. App. 2015) ("the United States Supreme Court has held that ex post facto challenges cannot be brought on an as-applied basis") (citing *Seling*).

In *Arthur v. United States*, 253 A.3d 134, 141 (D.C. 2021), the court questioned (in dictum) whether *Seling* bars all ex post facto challenges claiming that a statute is punitive as-applied. The *Arthur* court instead stated that "[a] more precise description of the holding of *Seling* is that the Supreme Court 'rejected the argument that a statute can be declared punitive "as applied" to a particular person when the highest State court has already definitively construed the statute as civil.'" *Id.* (quoting *In re Dutil*, 768 N.E.2d 1055, 1065 (Mass. 2002)). While that may be an accurate description of *Seling*'s core case-specific holding, *Seling*'s operative rationale is less case-specific and is broader. *Seling* was fundamentally concerned with the "unworkable" nature of as-applied analysis that "would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity." *Seling*, 532 U.S. at 263. That administrability concern is implicated whenever there is a series of discrete cases—each filed separately by a particular plaintiff or group of plaintiffs—asserting that the "application" of a statute is "punitive" (as there has been in Tennessee regarding SORA). The Court does not see why the presence or absence of a prior definitive construction of the statute as civil by the state's highest court is relevant to this key workability concern. Moreover, the Court in *Seling* made clear that its analysis turned on both "the prior finding by the Washington Supreme Court that the Act is civil, and [the U.S. Supreme] Court's decision in [*Kansas v. Hendricks*, 521 U.S. 346 (1997)] that a nearly identical Act was civil," 531 U.S. at 264, thus belying any notion that the state court's prior construction of the statute was necessary to *Seling*'s reasoning.

holds that, under *Seling*, the question whether SORA is civil or punitive is not amenable to as-applied analysis, but instead must be determined on the face of the statute without regard to any case-specific factors (other than the date of the individual's offense). In other words, SORA is either civil or punitive, and the Court must decide that question without reference to "the effect that Act has on a single individual." *See Seling*, 531 U.S. at 262.[15]

A further complication arises from the fact that many laws—SORA included—are amended over time. Even since SORA was first adopted in 2004, the General Assembly has "repeatedly revised [SORA] to increase its restrictions and requirements and to make more information about registered offenders publicly available." *See Doe #1*, 518 F. Supp. 3d at 1170 (collecting amendments to SORA from 2005 to 2015). Thus, the question of precisely *what law* is at issue (because it is retroactive) may vary depending on when the plaintiff committed his offense. Specific provisions of SORA may be retroactive (and thus subject to analysis to determine whether they are civil or punitive) as to one plaintiff but not another plaintiff. The list of retroactive SORA provisions will differ, for example, between: (i) the case of a plaintiff (like Plaintiff) who committed his offense in 2002, before any of SORA's most burdensome provisions went into effect; (ii) the case of a plaintiff who committed his offense in 2006 (when some of SORA's provisions were already in effect); and (iii) the case of a plaintiff who committed his offense in 2010 (when even more of SORA's provisions had already been enacted). The upshot is that even

---

[15] In a prior case challenging SORA under the Ex Post Facto Clause, the undersigned construed the plaintiffs' ex post facto claim to assert both facial and as-applied challenges, and ultimately concluded that SORA was unconstitutional to the two particular plaintiffs as applied. *Doe #1 v. Lee*, 518 F. Supp. 3d 1157 (M.D. Tenn. 2021). In that case, however, the parties seemed to assume the propriety of the plaintiffs' reliance on a range of case-specific circumstances particular to them; moreover and relatedly, none of the parties cited *Seling v. Young*, 531 U.S. 250 (2001), which, as the Court has already explained, mandates that a statute's punitive nature be determined on its face rather than as applied to a particular plaintiff. *See* Case No. 16-cv-2862 (M.D. Tenn.), Doc. Nos. 67, 74, 80, 91, 93, 104, 105.

if the cumulative effect[16] of the provisions that apply retroactively to one plaintiff who committed his offense at one time is punitive, that does not necessarily mean that the cumulative effect of the provisions that apply retroactively to a different plaintiff who committed his offense at a later date will necessarily also be punitive.

In sum, after distilling applicable case law, the Court discerns three generally applicable principles about how the "facial" and "as-applied" labels apply to ex post facto claims:

1) An ex post facto challenge to a law will never be a "pure" (or "classic") facial challenge, because it inherently can support invalidation of only *some* applications of the challenged law—namely retroactive (not prospective) applications.

2) The punitive character of a given law (or, to put it more precisely, the retroactive portions thereof) is determined based on the law's face, not based on its application to a specific plaintiff.

3) However, the specific law (provisions) that apply retroactively—and thus are assessed for whether they are punitive rather than civil in nature—must be determined based on the date that the particular plaintiff before the Court committed his offense; accordingly, a determination that the law being retroactively applied to one plaintiff who committed his offense at Time X is punitive will not necessarily compel a conclusion that the law being retroactively applied to a second plaintiff who committed his offense at Time Y is also punitive.

---

[16] The retroactive provisions of the law in question are to be considered *together* to determine whether their *cumulative* effect is punitive; the Court's task is not to parse the law's provisions separately and categorize them one-by-one as punitive or civil. This principle is implicit in the Supreme Court's phrasing of the inquiry as whether an entire "statutory scheme" or "Act" (not a "provision") is civil or punitive. *See, e.g.*, *Smith*, 538 U.S. at 92 ("Whether *a statutory scheme* is civil or criminal 'is first of all a question of statutory construction.'") (emphasis added) (quoting *Hendricks*, 521 U.S. at 361). Further, in *Seling* the Court stated that a major reason for prohibiting claims that a scheme is punitive as-applied is that such an analysis would be "unworkable," in that it "would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity under the . . . *Ex Post Facto* Clauses." 531 U.S. at 263. If the Court were required to parse a statute to pronounce one-by-one each of a statute's provisions as punitive or civil, that would pose just the sort of administrability concerns that *Seling* attempted to avert. Finally, in practice courts have examined the punitive effects of a law's provisions in combination, not in isolation. *See, e.g.*, *Snyder*, 834 F.3d at 701–05 (examining various provisions of Michigan's SORA—including geographical residence and work restrictions, tier classifications, in-person reporting requirements, and sanctions for failure to report—to determine that "Michigan's SORA imposes punishment").

Returning to the instant case, Plaintiff's Complaint describes each of his counts as "as-applied" ex post facto challenges. Count 1 asserts that SORA violates the Ex Post Facto Clause "as applied based on criminal offenses [like those that landed Plaintiff on the SOR] that occurred before SORA's effective date." (Doc. No. 1 at ¶ 75). Count 2 asserts that SORA violates the Ex Post Facto Clause "as applied to Plaintiff." (*Id.* at ¶ 80). In his Motion, Plaintiff describes Count 1 in a somewhat different manner, as not merely an "as-applied" challenge, but rather as a "hybrid as-applied/facial challenge: as-applied because it only attacks SORA's application to pre-enactment offenses, facial because the determination that SORA is punitive is made on its 'face,' *Seling v. Young*, 531 U.S. 250, 262 (2001), and thus not limited to Plaintiff's particular case." (Doc. No. 13 at 1 n.1). Plaintiff describes Count 2 as a wholly (solely) as-applied challenge, which claims that "SORA violates the Ex Post Facto Clause as applied to Plaintiff." (*Id.*).

It appears to the Court that the only difference between Count 1 and Count 2 is the *scope of the remedy* that Plaintiff intends to seek, not the substantive content of the claim. *See Bucklew*, 139 S. Ct. at 1127 ("[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation.") (quoting *Citizens Utd.*, 558 U.S. at 331). Via Count 1, Plaintiff seeks to prohibit the application of SORA to "any pre-SORA offense" (which necessarily would include Plaintiff's offense, which was committed pre-SORA). Via Count 2, Plaintiff seeks to prohibit the application of SORA to Plaintiff (and not anybody else). In both counts, Plaintiff claims that the application of SORA's provisions to offenses pre-dating the enactment of SORA violates the Ex Post Facto Clause; the only difference is that Count 1 seeks relief that is framed to benefit *anyone* who committed offenses pre-SORA, while Count 2 seeks relief framed to benefit *only Plaintiff*.

In his Motion, Plaintiff states that he seeks preliminary injunctive relief only on Count 2, and that he "does not presently seek preliminary injunctive relief on Count 1." (Doc. No. 13 at 1). So the Court will consider granting injunctive relief only to the extent sought and justified by Count 2. That is to say, the Court will entertain Plaintiff's request for a preliminary injunction as one seeking a prohibition of SORA's application to Plaintiff (and only Plaintiff)—the remedy that Count 2 requests. In so doing, however, the Court remains cognizant that the question of whether (and to what extent) SORA violates the Ex Post Facto Clause is not a plaintiff-specific question, with one exception alluded to elsewhere herein: the Court, in handling an ex post facto challenge brought by a particular plaintiff (including Plaintiff here), needs to determine what provisions of the applicable law are retroactive (thereby coming within the scope of the Ex Post Facto Clause) as to that plaintiff, considering when the plaintiff committed his or her offense(s).

2. *Analysis of Plaintiff's likelihood of success*

This Court has previously discussed in detail relevant Supreme Court and Sixth Circuit precedents addressing the constitutionality of SORA and other similar sex-offender registration laws. *See Doe #1*, 518 F. Supp. 3d at 1175–79 (discussing *Smith v. Doe*, 538 U.S. 84 (2003), *Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999), *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), and *Does #1–5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016)). In particular, the Sixth Circuit's published decision in *Snyder*, which found Michigan's similar Sex Offender Registration Act to be punitive in effect for purposes of the Ex Post Facto Clause, is of central importance to the Court's analysis. "The question of whether Tennessee's *ex post facto* application of its sexual offender requirements to individuals like [Plaintiff] is illegal under *Snyder* may not be entirely beyond debate, but the issue has been addressed so clearly and so many times that the court assumes that all of the attorneys and government officials involved understand the basic jurisprudential lay of the land."

*Does #1–9 v. Lee*, —F. Supp. 3d—, 2021 WL 5761039, at \*2. The Court will not here spill more ink analyzing the governing precedent, but instead refers the reader to its prior opinion, *Doe #1*, 518 F. Supp. 3d at 1175–79.

As noted earlier, Plaintiff's ex post facto claim has two elements: (1) retroactive application of (2) a punitive law. The Court's analysis will consider those elements in turn.

a. <u>Which provisions of SORA are retroactive?</u>

The first step in an ex post facto analysis is to identify precisely which provisions of the law at issue apply retroactively to the plaintiff, considering the date of his applicable offense(s). Here, Plaintiff requests a preliminary injunction prohibiting Defendants (i) "from enforcing [SORA], Tenn. Code Ann. §§ 40-39-201–40-39-218 . . . against Plaintiff, including the continued publication of Plaintiff's information on the [SOR]," and (ii) requiring Defendants "to remove Plaintiff's information from the SOR." (Doc. No. 12 at 1). Thus, Plaintiff requests the Court to preliminarily enjoin the entirety of SORA, Tenn. Code Ann. §§ 40-39-201 to -218.

As noted above, SORA was enacted to replace SORMA in 2004. The major provisions of SORA that Plaintiff argues constitute punishment—*i.e.*, the provisions expressly restricting where a Registrant can live, work, or travel; requiring in-person registration and reporting (including reporting within forty-eight hours of certain triggering events); prohibiting Registrants from being "alone with" a minor in a "private area"; and prohibiting certain Registrants from residing with minors, including their own children—were all enacted in 2003 or later.[17]

---

[17] As noted earlier, in 2003 (even before SORA's enactment), the General Assembly amended the predecessor statute, SORMA, to prohibit a SORMA registrant from establishing a residence or accepting employment within 1,000 feet of a school, a child care facility, or the home of the SORMA registrant's victim or the victim's immediate family member; coming within 100 feet of the victim; establishing a residence or other living accommodation with a minor who was not the SORMA registrant's own child; or establishing a residence with the SORMA registrant's own minor child, if any child of the SORMA registrant had been the registrant's victim or if the

However, two aspects of SORA predate Plaintiff's offense and are thus *not* retroactive for purposes of Plaintiff's claim. First, the Court finds that Plaintiff should not be removed from the SOR, because the registration requirement predates his 2002 offense. *See* 1994 Tenn. Pub. Acts, ch. 976, § 4 (requiring that "each sexual offender shall complete a TBI sexual offender registration/monitoring form and shall cause such form to be delivered to TBI headquarters in Nashville"); *id.* § 7(a) ("Using information received or collected pursuant to this act, the TBI shall establish, maintain, and update a centralized record system of sexual offender registration and verification information."). The Act's registration requirements do not meet the retroactivity element of Plaintiff's ex post facto claim, and Plaintiff is thus not likely to show that application of those requirements to him violates the Ex Post Facto Clause.

Second, for the same reason, the Court will decline to enjoin Defendants from publishing Plaintiff's information on the SOR.[18] Registry information for SORMA registrants who committed their offenses after July 1, 1997 was made publicly available as early as 1997. *See* 1997 Tenn. Pub. Acts, ch. 461, § 2 ("For all sexual offenses committed on or after July 1, 1997, the information concerning a registered sexual offender . . . shall be considered public information. In addition to making such information available in the same manner as other public records, the bureau shall

---

registrant's parental rights had been or were being terminated. 2003 Tenn. Pub. Acts, ch. 95, § 1. This amendment, though preceding SORA, occurred after Plaintiff's 2002 offense and thus is retroactive as applied to Plaintiff.

[18] To clarify, Plaintiff requested an injunction against publishing *on the SOR in particular* any information relating to Plaintiff, not an injunction against publishing *in places other than the SOR* Plaintiff's information that is found on the SOR.

prepare and place the information on the State of Tennessee's internet home page on or before January 1, 1998.").[19]

Otherwise, there appears to be no dispute as to the retroactivity element—*i.e.*, as to the extent to which SORA is retroactive as to Plaintiff—for purposes of this motion. All agree that Plaintiff committed his offense in 2002. (Doc. No. 13 at 3; Doc. No. 23 at 2). As described above, in 2002 SORA had not yet been enacted, and Defendants do not point to any other provisions of the current SORA (besides the ones the Court has already noted) that they argue have been in effect since before Plaintiff's offense in 2002. Accordingly, the Court accepts for purposes of this motion that the entirety of SORA, Tenn. Code Ann. §§ 40-39-201 to -218, is the law here at issue— at issue because it is retroactive as to Plaintiff—except for (i) SORA's baseline requirement that Plaintiff register with the TBI, and (ii) SORA's publication provision, Tenn. Code Ann. § 40-39-206(d). The upshot of these exceptions is as follows: (i) because the baseline requirement that Plaintiff register with the TBI is not retroactive as to Plaintiff, the Court will not order that Plaintiff's information be removed from the SOR, and (ii) because SORA's publication provision, Tenn. Code Ann. § 40-39-206(d) is not retroactive as to Plaintiff, the Court will not order that Plaintiff's information not be published on the SOR. For ease of reference, the Court will hereafter refer to SORA—minus its registration and publication requirements—as "Retroactive SORA."

---

[19] Specifically, the 1997 amendment made public a registrant's name, date of birth, home address, race, gender, photograph, driver's license information, parole/probation office, last date of verification of information by the registrant, and the qualifying offense or offenses of which the registrant has been convicted. 1997 Tenn. Pub. Acts, ch. 461, § 2.

    The Court does not consider whether, to the extent that amendments to SORMA and/or SORA since 2002 have increased the amount (*i.e.*, added to the types) of each Registrant's information required to be published on the SOR, that may create a retroactivity issue as to Plaintiff that is not implicated by the original (non-retroactive) 1997 requirement to publish a smaller set of each registrant's information. The preliminary injunction to be issued therefore neither prohibits nor definitively condones the publication of Plaintiff's information that was subjected to SORA's publication provisions only *after* Plaintiff committed his qualifying offense.

b.   Is Retroactive SORA punitive?

To determine whether a law is punitive, the Court employs a two-part "intent-effect test." Under the first (intent) prong, the Court asks whether the legislature *intended* the law to impose punishment. If not, the Court then asks whether, despite the legislature's "intention . . . to enact a regulatory scheme that is civil and nonpunitive," the statutory scheme is nonetheless "punitive either in purpose or effect."[20] *Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 361); *Snyder*, 834 F.3d at 700.

For purposes of this motion, Plaintiff concedes the first part of the test by "assum[ing] SORA is civil in intent." (Doc. No. 13 at 10).[21] Accordingly, the only issue for the Court is whether

---

[20] In directing the court to ask, as part of prong two, whether the statutory scheme is "punitive . . . in *purpose*," *Smith* seems to mandate a redundancy. That is, *Smith* seems to require the court to re-ask what it already asked at prong one, *i.e.*, whether the statutory scheme was punitive as a matter of legislative *intent*. Perhaps there is a difference between a statute's being punitive as a matter of legislative intent and a statute's being punitive "in purpose," but any such distinction strikes the undersigned as dubious and in any event too nuanced to be of much analytical value. Moreover, the caselaw appears to focus mainly (if not exclusively) on the law's *effect* at this second stage. *See Smith*, 538 U.S. at 97; *Snyder*, 834 F.3d at 701. And the parties here do not make any arguments based on the law's "purpose." Accordingly, the undersigned believes that if he reaches prong two, it is precisely because he has already determined that the statutory scheme is not "punitive in purpose," and that he should focus on what prong two clearly is supposed to be about anyway: whether the statutory scheme is punitive *in effect*.

[21] *See* Tenn. Code Ann. § 40-39-201(b)(6) ("This policy of authorizing the release of necessary and relevant information about offenders to members of the general public is a means of assuring public protection and shall not be construed as punitive[.]"); *id.* § 40-39-201(b)(8) ("[I]n making information about certain offenders available to the public, the general assembly does not intend that the information be used to inflict retribution or additional punishment on those offenders."); *Ward*, 315 S.W.3d at 470 ("The plain language of [SORA] expresses a nonpunitive intent to protect the public.").

In *Ward*, the Tennessee Supreme Court considered whether a state trial court conducting a plea colloquy must inform the defendant that his guilty plea will require him to register under SORA. In that context, the Tennessee Supreme Court concluded that "the registration requirements imposed by the sex offender registration act [as it existed in 2010] are nonpunitive and . . . they are therefore a collateral consequence of a guilty plea," such that a trial court need not inform the defendant of his obligation to register before pleading guilty. *Id.* at 469. In reaching this conclusion, the Tennessee Supreme Court relied mostly on the General Assembly's stated intent

Retroactive SORA has a punitive effect. *Smith*, 538 U.S. at 92; *Snyder*, 834 F.3d at 700. In analyzing this question, the Court is mindful that it "ordinarily defer[s] to the legislature's stated intent," and so "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Smith*, 538 U.S. at 92 (first quoting *Hendricks*, 521 U.S. at 361, and then quoting *Hudson*, 522 U.S. at 100).

To determine whether the effect of a law is punitive, the Supreme Court has instructed lower courts to "refer to" seven factors originally noted in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69 (1963). *Smith*, 538 U.S. at 97. And of these seven "*Mendoza-Martinez* factors," the Court has identified five as the most relevant to analyzing the effect of a sex offender-registration law. *Id.* The Sixth Circuit has since reformulated these five factors into five respective questions for courts to consider:

1) Does the law inflict what has been regarded in our history and traditions as punishment?
2) Does it impose an affirmative disability or restraint?
3) Does it promote the traditional aims of punishment?
4) Does it have a rational connection to a non-punitive purpose?
5) Is it excessive with respect to this purpose?

---

in enacting SORA. *Id.* at 469–70. Although *Ward* also purported to analyze SORA's punitive effect, *id.* at 472, it did not do so by considering the *Mendoza-Martinez* factors. Accordingly, *Ward* does not answer the question whether SORA is punitive under the second prong of the "intent-effect" test for ex post facto challenges established by U.S. Supreme Court precedent. Other district courts have similarly understood *Ward* to speak to the General Assembly's intent on the first prong, but not SORA's effects on the second prong. *See Jackson*, 2021 WL 4302769, at *5; *Doe v. Rausch*, 461 F. Supp. 3d at 761; *Doe v. Rausch*, 382 F. Supp. 3d at 793. Moreover, even if *Ward* had addressed SORA's punitive effect in the manner contemplated by U.S. Supreme Court precedent, it still would not settle the question of whether SORA is punitive in effect *now* following subsequent amendments to the statute. *See Foley v. State*, No. M2018-01963-CCA-R3-PC, 2020 WL 957660, at *9 (Tenn. Crim. App. Feb. 27, 2020) (Holloway, J., concurring) (calling for reevaluation of *Ward* in light of the fact that "the residential and work restrictions in [SORA] have become much more onerous during the ten years that have elapsed since the issuance of *Ward*").

*Snyder*, 834 F.3d at 701 (citing *Smith*, 538 U.S. at 97).[22]

The *Mendoza-Martinez* factors are neither elements nor a true multi-factor test. Instead, they are merely "useful guideposts" to aid a court in answering the ultimate question of whether a law's effect is so punitive as to negate the state's intention to enact a civil law. *Smith*, 538 U.S. at 97 (quoting *Hudson*, 522 U.S. at 99). The *Mendoza-Martinez* factors are thus "neither exhaustive nor dispositive." *Id.* (quoting *United States v. Ward*, 448 U.S. 242, 249 (1980)). The Court could, in theory, examine additional pertinent factors or arguments not specifically contemplated by the *Mendoza-Martinez* factors. However, the parties have not identified any such additional factors or arguments in their briefs, and none are apparent to the Court. The Court will thus confine its analysis to the *Mendoza-Martinez* factors.

_____

[22] The undersigned here will reiterate what he has said previously about multi-factor tests generally:

> "The undersigned has noted on multiple occasions that multi-factor (or balancing) tests, though often having considerable desirability and merit, tend to foster outcomes that are unpredictable on the front end, given such tests' subjectivity." *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *16 (M.D. Tenn. Aug. 28, 2020) (quoting Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable endeavor") and Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 95 (1995) (proposing multi-factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations")). This reality tends not to bode well for the prospects of a multi-factor test to resolve a question as a matter of law at the summary judgment stage.

*Acosta v. Peregrino*, No. 17-cv-01381, 2020 WL 5995049, at *6 (M.D. Tenn. Oct. 9, 2020). The undersigned is well aware that room for disagreement exists with respect to the proper result of the outcome of the multi-factor test to be employed here; this is especially true because, as noted elsewhere herein, the commonly recognized factors are neither exhaustive nor dispositive. But he must call it like he sees it after weighing each factor in turn, and he will do just that.

As explained above, the question that the *Mendoza-Martinez* factors help to answer—whether the law in question is punitive in its effects—must be analyzed based on the face of the statute, not on its particular application to Plaintiff. *See Doe*, 2021 WL 1907813, at *13 ("As the *Mendoza-Martinez* factors plainly account for, some legal consequences, in light of their nature, context, and social function, simply *are punishments*, regardless of any variation in the individual's subjective experience of that consequence.").

Before turning to the individual factors, the Court will first address a cross-cutting argument that Defendants make with regard to multiple factors. Defendants repeatedly argue that SORA is not punitive because Plaintiff is presently classified as a "sexual offender," not a "violent sexual offender," and so he is eligible to apply to the TBI for termination of his registration requirement after five years pursuant to Tenn. Code Ann. § 40-39-207(i)(4)(B).[23] (Doc. No. 23 at 5, 12, 18). Defendants argue that "the district courts extending *Snyder* to hold the Act unconstitutional upon which Plaintiff relies all also involved offenders who were required to register for life. Plaintiff has not cited, and Defendants have not found, a single case holding a

_____

[23] Tenn. Code Ann. § 40-39-207(i)(4) provides:

> Unless otherwise authorized by law, a person required to register as any form of a sexual offender in this state due to a qualifying offense from another jurisdiction which is classified as a sexual offense in this state may apply for removal from the registry pursuant to subdivision (a)(1) following the later of:
>
> > (A) Ten (10) years from the date of termination of active supervision or probation, parole or any other alternative to incarceration, or after discharge from incarceration without supervision; or
> > (B) Five (5) years after being added to the Tennessee sexual offender registry.

Defendants' position appears to be that, because Plaintiff's sentence (apparently including parole) terminated in 2007, and thus ten years from the date of termination of his parole occurred in 2017, he is eligible to apply for removal from the registry under subsection (B) five years after being added to the registry (*i.e.*, in 2027).

five-year registration requirement unconstitutional." (Doc. No. 23 at 5 (footnote omitted)). In support of this argument, Defendants cite *Jackson v. Rausch*, No. 19-cv-377, 2021 WL 4302769, at *9–10 (E.D. Tenn. Sept. 21, 2021), in which the court indeed found that SORA was not punitive as applied to the particular plaintiff in large part because the particular plaintiff (like Plaintiff in this case) was potentially subject to SORA for only five years, after which the plaintiff could request removal from the SOR. (Doc. No. 23 at 18).

The Court does not find Defendants' argument persuasive. The argument amounts to a claim that Retroactive SORA is not punitive as applied to Plaintiff because of the specifics of when he, as opposed to other Registrants, may apply for removal from the SOR.[24] But under *Seling*, the salient question is whether Retroactive SORA is civil or punitive on its face, not "the effect [SORA] has on a single individual." *See Seling*, 531 U.S. at 262. The specifics of when Plaintiff (as distinguished from other Registrants) is eligible to apply to the TBI for removal do not affect the Court's determination of whether Retroactive SORA, as a whole, is punitive on its face. *See Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *19 ("The *Mendoza-Martinez* factors . . . look at the broad, general features of a law on its face. They do not call for a fine-grained analysis of the day-to-day effects of a law on any given person in any given situation, because the factors are designed to render a verdict regarding whether a law is punitive or non-punitive with regard to

_____

[24] In *Doe #1*, 518 F. Supp. 3d at 1204, this Court did discuss the potential significance of lifetime registration (required for the plaintiffs in that case but not for many other Registrants) to the analysis of whether SORA is punitive in effect. However, as already noted *supra* at note 15, in that case the parties proceeded on the assumption that SORA could be punitive as applied to particular plaintiffs based on case-specific facts, and none of the parties cited *Seling* or addressed its significance. In light of *Seling*, whether a *particular* plaintiff must register for life actually is not relevant to whether SORA's effects are punitive, a question to be answered based on the face of SORA.

*everyone*.").[25] Further, the fact that Plaintiff apparently may, five years from now, "file a request for termination of registration with TBI headquarters in Nashville," Tenn. Code Ann. § 40-39-207(a)(1), (i)(4)(B), does not persuade the Court that Retroactive SORA looks any less like punishment. As will be explained below, the Court concludes that Retroactive SORA resembles probation and parole. Probation and parole can (and often do) last for five years or less. Defendants offer no basis to conclude that short-term probation or parole is not punishment. As Plaintiff persuasively argues, "Five years' imprisonment is less severe than life, but punishment nonetheless." (Doc. No. 25 at 2).[26]

The Court will now proceed to analyze each *Mendoza-Martinez* factor in turn, mindful that they are only guideposts toward the ultimate end of determining whether Retroactive SORA is punitive in its effects.

---

[25] This analysis applies equally to Defendants' argument that this case is distinguishable from *Snyder* because the plaintiffs in *Snyder* were required to report in person a minimum of four times per year, whereas here Plaintiff must report in person a minimum of only once per year. (Doc. No. 23 at 12).

[26] Plaintiff avers that, although present TBI counsel has classified Plaintiff's offense as a "sexual offense" rather than a "violent sexual offense," Plaintiff's arresting officer told him that the officer had "lobbied hard" for the TBI to classify Plaintiff as a "violent sexual offender." (Doc. No. 12-1 at ¶ 7.) If Plaintiff were classified as a "violent sexual offender," he would be required to register for life. *See* Tenn. Code Ann. § 40-39-207(g)(2)(B). Plaintiff "fear[s] that future TBI counsel may interpret SORA differently and re-classify [him] as a 'violent sexual offender.'" (Doc. No. 12-1 at ¶ 7). Plaintiff implies that this is a reason why the possibility that he will be able to apply for removal from the registry in five years should not affect the analysis of whether SORA is punitive. (Doc. No. 25 at 1 n.1). The Court finds this concern speculative and does not factor it into its analysis, other than to note that, if TBI counsel can indeed move offenders between classifications, that is further reason to look at SORA as a whole—rather than individual provisions that apply (at least at the moment) retroactively to a particular plaintiff—to determine whether the Act's effects are punitive.

*i.* *Does Retroactive SORA inflict what has been regarded in our history and traditions as punishment?*

Under the first factor, the Court considers whether the effects of Retroactive SORA resemble traditional forms of punishment. One consideration relevant to this factor is whether the law at issue meets the general definition of punishment offered by legal philosopher H.L.A. Hart: (1) it involves pain or other consequences typically considered unpleasant; (2) it follows from an offense against legal rules; (3) it applies to the actual (or supposed) offender; (4) it is intentionally administered by people other than the offender; and (5) it is imposed and administered by an authority constituted by a legal system against which the offense was committed. *Snyder*, 834 F.3d at 701 (citing H.L.A. Hart, *Punishment and Responsibility* 4–5 (1968)). This Court has already concluded that SORA falls within that general definition. *Doe #1*, 518 F. Supp. 3d at 1184. Defendants identify no reason to revisit that conclusion.

Plaintiff also argues that SORA resembles the traditional punishments of (1) probation and parole, (2) banishment, and (3) shaming. The Court will consider each in turn.

*Probation and parole.*[27] Plaintiff argues that SORA resembles the traditional punishments of probation and parole "because of [SORA's] in-person reporting requirements, Tenn. Code Ann.

---

[27] The parties do not distinguish between probation and parole. The two, however, are not identical:

> While probation and parole are similar and are often confused, they differ in several important respects. Probation is a sanction imposed by a court as punishment for a criminal offense. Probationers must adhere to a set of conditions that can severely limit their freedom. Probation is generally given in lieu of a prison sentence, although a short jail term may also be imposed as a condition of release. If the conditions of probation are breached, the offender can be sentenced to prison following a judicial revocation proceeding.

> Parole, on the other hand, is an administrative rather than a judicial procedure. Parole, unlike probation, begins after an offender has completed service of part of a prison term. The parole board permits the prisoner to serve the remaining part of the sentence in the community, but requires the offender to abide by a set of release

§ 40-39-204(b)(1) (2021), its extensive restrictions on where offenders may live, work, or be present, *id.* § 40-39-211(a) & (d) (2021), and its severe criminal penalties for failure to comply, *id.* § 40-39-208." (Doc. No. 13 at 13). This Court has already agreed with Plaintiff's argument:

> Similar to *Snyder*[], all registrants under the Tennessee system have numerous restrictions. SORA requires registrants to update changes to certain information [within] 48 hours. Tenn. Code. Ann. § 40-39-203(a)(1). Violent sexual offenders must report in person four times a year. Tenn. Code. Ann. § 40-39-204(b)(1). All sexual offenders must report in person once a year. *Id.* at (c). All sexual offenders must report at least 21 days before leaving the country, with a few exceptions. *Id.* at (h). Within three days of changing "internet communication name or identity information," an offender must report the change. Tenn. Code. Ann. § 40-39-203(a)(7). . . . [R]egistrants also have numerous geographic restrictions on where they live, work, and spend time. . . .
>
> Looking at the statute on its face, all registrants face some level of monitoring and in-person reporting requirements. These in-person reporting and supervision restrictions faced by . . . offenders generally are similar to those found to resemble probation in *Snyder* [] and [*Doe v. Rausch*, 461 F. Supp. 3d 747 (E.D. Tenn. 2020)] and they appear to have a similar effect.

*Doe #1*, 518 F. Supp. 3d at 1196. Accordingly, this Court found that SORA "facially" resembled probation. *Id.*[28]

───────────────

conditions similar to those imposed on probationers. If a parole condition is breached, the offender can be returned to prison for the remaining part of the original prison term.

Neil P. Cohen, *Law of Probation & Parole* § 1:1 (2d ed.), Westlaw (database updated September 2021) [hereinafter Cohen, *Law of Probation & Parole*] (footnotes omitted). The parties' failure to distinguish between the two is understandable, given that the Sixth Circuit in *Snyder* also lumped probation and parole together for its punitive effects analysis. *See* 834 F.3d at 703 (finding that "SORA also resembles the punishment of parole/probation"). The Court does not perceive a relevant distinction between probation and parole for purposes of this analysis. *See* Cohen, *Law of Probation & Parole* § 1:1 (stating that probation and parole are "similar in most respects"). The Court will thus analyze probation and parole together to determine whether Retroactive SORA resembles them.

[28] Plaintiff avers that SORA's reporting and supervision requirements are similar to, but more restrictive and onerous than, the reporting and supervision he personally experienced while serving his sentence on parole in Michigan. (Doc. No. 12-1 at ¶¶ 9–10, 12). Plaintiff's personal experiences on parole are not relevant to the question whether Retroactive SORA facially resembles parole,

Defendants do not directly address this reasoning from *Doe #1*. Instead, Defendants cite *Shaw v. Patton*, 823 F.3d 556, 565 & n.14 (10th Cir. 2016), in which the Tenth Circuit set forth a list of typical conditions of probation.[29] Defendants argue that because SORA does not require these same conditions, it does not resemble parole or probation. (Doc. No. 23 at 10–11). This argument fails because the inquiry is not whether Retroactive SORA is *identical* to probation and parole, but merely whether it "resembles" those traditional punishments.[30] *See Snyder*, 834 F.3d at 703; *Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *16 ("the *Mendoza-Martinez* factors do not look merely to whether a law exactly replicates a traditional punishment, but whether it 'resembles' one"). Thus, in *Snyder*, the Sixth Circuit found that Michigan's statute was punitive in effect where it had "a number of similarities to parole/probation," even though the court acknowledged Michigan's law was "not identical to any traditional punishments." 834 F.3d at 703. *Snyder* found that Michigan's law sufficiently resembled parole and probation because "registrants

---

except to the extent they may inform the Court's understanding of what parole generally entails. Here, given the Sixth Circuit's analysis in *Snyder* and this Court's own analysis in *Doe #1*, the Court need not consider whether Plaintiff's personal experiences accurately describe parole as a general matter.

[29] Specifically, *Shaw* noted that conditions of probation historically have typically required probationers to, among other things: accept the first offer of employment; obtain written consent from a probation officer before moving or changing jobs; financially support family members; report monthly to the probation office; avoid all "evil associations," including abstaining from drugs and alcohol; submit to searches of person and property on no more than reasonable suspicion of a probation violation or criminal activity; submit to random drug tests; permit state agents to visit their homes; perform community service; go on house arrest; and sometimes serve time in a county jail. 823 F.3d at 565 & n.14 (citing *State v. Petersen-Beard*, 377 P.3d 1127, 1137 (Kan. 2016)).

[30] The undersigned realizes that whether one thing resembles another is often in the eye of the beholder; one person may view one thing as "resembling" another, whereas another person would not. But the undersigned must call it like he sees it (based on, among other things, guidance provided by precedent), pronouncing his view as to whether Retroactive SORA resembles parole and probation.

are subject to numerous restrictions on where they can live and work and, much like parolees, they must report in person, rather than by phone or mail. Failure to comply can be punished by imprisonment, not unlike a revocation of parole." *Id.* Defendants do not explain how Retroactive SORA differs from Michigan's statute in these material aspects, which the Sixth Circuit found sufficient to conclude that Michigan's statute "resembled" parole and probation. Moreover, probation in one case will often have different conditions from probation in another case. *See, e.g.*, 18 U.S.C. § 3563(b)(1)–(23) (listing discretionary conditions of probation). That certain conditions of probation are imposed in one case but not the other does not mean they are not *both* "probation." A difference in conditions by itself does not necessarily distinguish probation from something that is not probation. Thus, the numerous distinctions Defendants cite—which merely show that Retroactive SORA is not *identical* to probation and parole, a point *Snyder* conceded with respect to Michigan's law—do not undermine the conclusion that Retroactive SORA is sufficiently similar to probation and parole to constitute punishment. *See Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *16 (stating that *Snyder* "explicitly did not require the conditions of inclusion on the registry to be identical to the conditions of parole in order for there to be a constitutionally persuasive resemblance").[31]

Defendants also argue that, unlike SORA Registrants, probationers are "traditionally subject to the active supervision of a probation officer." (Doc. No. 23 at 10 (citing *Shaw*, 823 F.3d

---

[31] The undersigned will offer a slight variation on a point he has already made in the footnote immediately above. Specifically, as he made clear decades ago, he understands that if two things are not deemed identical (or "the same"), the question of whether they are properly deemed "similar" to each other is often a subjective one because "a subtle, inscrutable continuum runs from 'different,' [to] 'similar[.]'" Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 70 (1995). But once again, the Court must call it like it sees it, assessing whether Retroactive SORA is sufficiently similar to parole and probation that it can be said to resemble those punishments.

at 564)). But *Snyder* considered this argument, too, and found it to be merely another basis on which Michigan's statute and parole/probation were perhaps not identical, but nonetheless bear a resemblance. *Snyder*, 834 F.3d at 703 ("while the level of individual supervision [under Michigan's law] is less than is typical of parole or probation, the basic mechanism and effects have a great deal in common"). In addition, "[w]hile large numbers of probationers and parolees are under the actual supervision of a caseworker, some are released without any supervision at all. . . . Often the only condition is that they refrain from new criminal activity during the probation term." Cohen, *Law of Probation & Parole* § 17:6. So the degree of supervision—or even the absence thereof—is also not by itself sufficient to destroy Retroactive SORA's resemblance to probation.

Defendants further contend that, while SORA is "enforceable through criminal penalties, those penalties are a consequence distinct from Plaintiff's original offense—unlike the possibility that parole or probation may be revoked, which is tied to the underlying criminal punishment." (Doc. No. 23 at 11). But *Snyder* found the enforceability of Michigan's law via criminal penalties to be a characteristic that *supported* finding a resemblance between Michigan's law and probation/parole: "Failure to comply can be punished by imprisonment, not unlike a revocation of parole." 834 F.3d at 703. And *Snyder* did not seem concerned by the fact that any criminal penalties for violating Michigan's law were distinct from the violator's original criminal offense (unlike in the case of penalties for a probation or parole violation).[32]

---

[32] *But see Hope v. Comm'r of Ind. Dep't of Corr*, 9 F.4th 513, 532 (7th Cir. 2021) (en banc) (distinguishing *Snyder*, and concluding that Indiana's SORA is "distinct from parole" because although "plaintiffs may face criminal prosecution for failure to comply with reporting requirements," that "would be a consequence distinct from the plaintiffs' original offenses; parole and the supervisor's ability to seek revocation of it are tied to the terms of the original offense. A sex offender who violates [Indiana's] SORA is not subject to revocation—but rather a new criminal prosecution for violating state law."). This Court, of course, is bound by the Sixth Circuit's published opinion in *Snyder* and not by the contrary reasoning of *Hope*.

*Banishment*. In a prior decision, this Court concluded that two individual plaintiffs—both of whom resided in Davidson County—had shown that SORA banished them *from Davidson County*, but did *not* show that they were banished from *anywhere else* in Tennessee. *Doe #1*, 518 F. Supp. 3d at 1184–88. In particular, the Court relied on three maps of Davidson County that the plaintiffs in that case submitted to support their argument (without Defendants objecting that the maps impermissibly injected the plaintiffs' particular circumstances into the analysis), showing that SORA excluded them from a large percentage of Davidson County. *Id.* at 1186–87. Here, Plaintiff argues that the Court should take judicial notice of those same maps of Davidson County introduced by the *Doe #1* plaintiffs. (Doc. No. 13 at 13). Plaintiff also cites two other decisions of this Court, which suggest that SORA may effectively banish Registrants at least from Nashville and "Tennessee's denser cities." (Doc. No. 13 at 12 (citing *Reid I*, 476 F. Supp. 3d at 707, and *Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *18). Accordingly, Plaintiff argues that the Court should take judicial notice that Registrants are effectively banished from "every urban area in this state." (Doc. No. 13 at 12). For their part, Defendants (likely following Plaintiff's lead) also debate statistics regarding Davidson County. (Doc. No. 23 at 7–8). Neither party notes that Plaintiff does not actually live in Davidson County, but rather lives in a less populated county in East Tennessee.[33] The parties thus focus their briefing on SORA's effects in Davidson County and other urban areas of Tennessee, but they do not address how these effects in Davidson County and other urban parts of the state should affect the banishment analysis (if at all) when the particular plaintiff lives in a less urban part of the state. It may be that an analysis of Davidson County is pertinent because, regardless of where Plaintiff actually lives, under *Seling*'s facial standard the relevant

---

[33] The precise city and county of Plaintiff's residence are stated in the unredacted version of his declaration (Doc. No. 15 at ¶ 2), which Plaintiff has requested leave to file under seal (Doc. No. 14). That motion remains pending and the Court does not address it herein.

question is whether Registrants are banished from large urban areas in Tennessee (even if the particular plaintiff before the Court does not live in those places). But without guidance from the parties on this issue, the Court declines to address Retroactive SORA's resemblance to banishment at this preliminary stage.[34]

*Shaming.* Although Plaintiff's opening brief states in one of the subheadings of its argument that SORA resembles "public shaming," (Doc. No. 13 at 11), Plaintiff does not support this argument anywhere in the body of his opening brief. (*See id.* at 11–13). Plaintiff's reply addresses shaming briefly, arguing that SORA resembles shaming because "SORA's restrictions

---

[34] As Defendants note, "this Court has already concluded that the maps of Davidson County [in *Doe #1*] are insufficient to support a claim that the Act is invalid on its face." (Doc. No. 23 at 8 (citing *Doe #1*, 518 F. Supp. 3d at 1188)). In this preliminary posture, the Court is hesitant to revisit that conclusion without on-point briefing from the parties. *See Arizona*, 31 F.4th at 483 (Sutton, C.J., concurring) ("Imperatives of speed in decisionmaking . . . do not always translate into accuracy in decisionmaking.").

Some courts have focused their banishment analysis not on where the particular plaintiff lives, but rather on the most populous cities in the State. *Snyder*'s reliance on maps of Grand Rapids, Michigan, to evaluate Michigan's statute lends some support to this approach. *See Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *17 (noting that *Snyder* relied on maps of Grand Rapids, a city with a population of about 200,000, and that "the markedly *more* populous cities of Nashville (pop. ~690,000) or Memphis (pop. ~645,000)" would presumably result in similar, if not greater, restrictions on Registrants) (footnotes omitted). As this Court explained in *Reid II*:

> Of course, there are places in Tennessee where less-dense development [than in Nashville and Memphis] presumably makes compliance easier. Again, though, that is an argument that could have prevailed in *Snyder* but did not. Michigan, like Tennessee, is a diverse state with various different types of communities, and the *Snyder* court expressly acknowledged that the Michigan regime was likely more burdensome in "densely populated areas" than elsewhere. *Snyder*, 834 F.3d at 701. That did not dissuade the Sixth Circuit from looking at the effects of the Act in those densely populated areas and concluding that they supported a finding of punitive effect.

—F. Supp. 3d—, 2022 WL 1050645, at *17. This analysis appears to be consistent with the facial inquiry mandated by *Seling*, insofar as it would require the Court to determine Retroactive SORA's resemblance to banishment without reference to plaintiff-specific facts. However, the Court declines to reach a definitive conclusion on the relevance of an analysis of Davidson County to the question of banishment without adequate briefing and in this preliminary posture.

hang around Plaintiff's neck like a virtual scarlet letter. This ignominy flows not from his offense but from SORA's legal proscriptions." (Doc. No. 25 at 3). The Court does not find that Plaintiff's briefing, which relies almost exclusively on a single colorful metaphor, addresses shaming thoroughly enough to allow the Court to analyze it at this juncture.[35]

In sum, the Court finds that Plaintiff has demonstrated a strong likelihood that he will succeed in showing that Retroactive SORA resembles the traditional punishments of parole and probation. Accordingly, this first factor favors Plaintiff and a finding that Retroactive SORA is likely punitive on its face. The Court does not address at this stage of the litigation whether Plaintiff is likely to succeed in showing that Retroactive SORA resembles banishment or shaming. This does not, however, affect its conclusion on this factor, as it is not necessary that Retroactive SORA resemble *more than one* traditional form of punishment; one is sufficient for this factor to favor Plaintiff.

> ii.    *Does Retroactive SORA impose an affirmative disability or restraint?*

This Court previously found that, under this factor, SORA facially imposes an affirmative restraint on a Registrant's personal conduct. *Doe #1*, 518 F. Supp. 3d at 1197. A Registrant faces "serious punishment, including imprisonment" if he fails to comply with in-person reporting

---

[35] This Court previously found that SORA resembles shaming, in a case brought by two plaintiffs who were designated under the Act as a "violent sexual offender" and an "offender against children," respectively. *Doe #1*, 518 F. Supp. 3d at 1189–95. Plaintiff in this case is apparently not labeled as either a "violent sexual offender" or an "offender against children." *See* Doc. No. 1 at ¶ 27 ("The TBI currently classifies Plaintiff's sex offense as a 'sexual offense' rather than a 'violent sexual offense.'"); Tenn. Code Ann. § 40-39-202(10) (defining "offender against children" as a Registrant whose victim "was a child of twelve (12) years of age or less"). Although the Court in this opinion has concluded that Retroactive SORA's punitive effect must be determined from the face of the statute, the Court declines to simply import its prior conclusion regarding shaming into this case without adequate briefing from the parties, especially since this case involves Retroactive SORA, not the entirety of SORA, and this case also does not involve the same derogatory statutory categories that were implicated in the prior case.

requirements and particular geographic restrictions. *Id.* "[T]hese requirements and restrictions resemble probation, and probation is a restriction on liberty." *Id.*; *see United States v. Knights*, 534 U.S. 112, 119 (2001) (noting that probation inherently entails restricting liberty to which the probationer otherwise would be entitled); *Blanton v. City of N. Las Vegas, Nev.*, 489 U.S. 538, 542 (1989) (noting that probation "may engender a significant infringement of personal freedom") (internal quotation marks and citation omitted); United States Sentencing Commission, *Federal Sentencing: The Basics*, at 8 (discussing probation as a "form of deprivation of liberty"). The Court thus found SORA to be a "direct restraint on personal conduct." *Doe #1*, 518 F. Supp. 3d at 1197 (quoting *Doe v. Rausch*, 461 F. Supp. 3d at 765).

Defendants argue that nothing short of "physical restraints or obligations so onerous that they approach imprisonment" will make this factor cut in favor of a Registrant. (*See* Doc. No. 23 at 12). In support of that argument, Defendants rely on out-of-circuit precedent in which courts have found sex-offender registration laws to be civil in nature when they imposed residency restrictions of 500 feet, *Vasquez v. Foxx*, 895 F.3d 515, 522 (7th Cir. 2018), 1,000 feet, *Hope*, 9 F.4th at 531, and 2,000 feet, *Shaw*, 823 F.3d at 570. (Doc. No. 23 at 12–13). Defendants also note that, in *Hope*, 9 F.4th at 532, the Seventh Circuit listed various "onerous burdens" that the Supreme Court has found not to amount to punishment—including fines, occupational debarment, denial of government benefits, and even certain forms of involuntary confinement. (Doc. No. 23 at 12). *See Hope*, 9 F.4th at 532 (citing *Hudson*, 522 U.S. at 104; *Flemming v. Nestor*, 363 U.S. 603, 617 (1960); and *Hendricks*, 521 U.S. at 363).

Defendants' arguments are once again foreclosed by binding Sixth Circuit precedent. In *Snyder*, Michigan argued under this factor that the relevant restraints—including the Michigan statute's prohibition on living, working, or loitering within 1,000 feet of a school—were "not

physical in nature" and were therefore "minor and indirect." 834 F.3d at 703. The Sixth Circuit expressly rejected the notion that only physical restraints are sufficiently serious to make this factor cut in the plaintiff's favor: "something is not 'minor and indirect' just because no one is actually being lugged off in cold irons bound. Indeed, those irons are always in the background since failure to comply with these restrictions carries with it the threat of serious punishment, including imprisonment." *Id.* Defendants do not attempt to explain why this reasoning from *Snyder* does not apply equally here.

Defendants cite *Smith v. Doe* for the proposition that "registration requirements make a valid regulatory program effective and do not impose punitive restraints in violation of the *Ex Post Facto* Clause." 538 U.S. at 102. (Doc. No. 23 at 12). But Plaintiff challenges more than just SORA's bare registration requirement (which, as discussed above, is excluded from Retroactive SORA in any event); he challenges the residency restrictions and in-person reporting requirements (among other retroactive provisions of SORA), which are similar to those in the Michigan statute the Sixth Circuit has already distinguished from the Alaska statute at issue in *Smith. See Snyder*, 834 F.3d at 703 (stating that the Michigan statute's restraints "are greater than those imposed by the Alaska statute by an order of magnitude" because, for example, the Alaska statute did not require information to be updated in person).

       *iii.*    *Does Retroactive SORA promote the traditional aims of punishment?*

*Snyder* found that Michigan's statute "advances all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence." 834 F.3d at 704. The court noted that:

> Its very goal is incapacitation insofar as it seeks to keep sex offenders away from opportunities to reoffend. It is retributive in that it looks back at the offense (and nothing else) in imposing its restrictions, and it marks registrants as ones who cannot be fully admitted into the community. Further, . . . it does

so in ways that relate only tenuously to legitimate, non-punitive purposes. Finally, its professed purpose is to deter recidivism (though . . . it does not in fact appear to do so), and it doubtless serves the purpose of general deterrence.

*Id.* However, the court in *Snyder* gave this factor "little weight," noting that the same goals can also be described as "civil and regulatory." *Id.*

As Plaintiff argues, *Snyder*'s "conclusion that the Michigan scheme 'advance[d] all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence' can simply be imported, effectively word-for-word, into an analysis of Tennessee's Act." (Doc. No. 13 at 14 (quoting *Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *18)). Accordingly, this factor favors Plaintiff, although the Court gives it "little weight," as did the court in *Snyder*.

> iv.   *Does Retroactive SORA have a rational connection to a non-punitive purpose?*

Retroactive SORA's rational connection to a nonpunitive purpose is a "'most significant' factor" in determining whether the law's effects are punitive. *Smith*, 538 U.S. at 102 (brackets omitted) (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)). For purposes of this Motion, Plaintiff "assumes SORA has a non-punitive purpose of preventing future acts of sexual violence." (Doc. No. 13 at 15). *Cf. Smith*, 538 U.S. at 102–03 (finding that the Alaska Sex Offender Registration Act "has a legitimate nonpunitive purpose of public safety, which is advanced by alerting the public to the risk of sex offenders in their community") (internal quotation marks and brackets omitted).

Plaintiff argues that SORA lacks a rational connection to this non-punitive purpose, given the Sixth Circuit's conclusions about the empirical evidence before it in *Snyder*. (Doc. No. 13 at 14–15). In *Snyder*, the court canvassed empirical studies placed into the record in that case, which cast "significant doubt" on the risk of recidivism posed by sex offenders. 834 F.3d at 704–05. The

court cited studies in the record suggesting that "sex offenders (a category that includes a great diversity of criminals, not just pedophiles) are actually *less* likely to recidivate than other sorts of criminals," and that "laws such as [Michigan's statute] actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* The *Snyder* court thus found "scant support for the proposition that [Michigan's statute] in fact accomplishes its professed goals," based on the record in that case. *Id.* at 704.

Plaintiff also argues that SORA is not rationally connected to its non-punitive purpose of preventing recidivism because SORA does not tailor its restrictions to actual risks posed by individual Registrants. Instead, Plaintiff argues, SORA "simply imposes its restrictions automatically on every person convicted by a jury of committing a certain type of criminal offense—in other words, like a punishment." (Doc. No. 13 at 15 (quoting *Reid II*, — F. Supp. 3d—, 2022 WL 1050645, at *18)).

At the preliminary injunction stage, the Court finds that the empirical evidence discussed in *Snyder* is sufficient to show that this factor is likely ultimately to favor Plaintiff. There is no reason to think that the empirical evidence discussed in *Snyder* "would apply differently in Tennessee than it does in Michigan." *See Reid I*, 476 F. Supp. 3d at 707. Defendants certainly do not suggest any such reason. The Court also finds it significant that, in other cases recently decided in this Court, these same Defendants conceded for the purposes of summary judgment "that they do not actually have any evidence that the restrictions imposed [by SORA] on individuals like [the

plaintiff] make crimes, let alone crimes against children, less likely." *Jordan*, 2022 WL 1196980, at *18; *Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *18.[36]

Defendants respond that Plaintiff "bears the burden" on this factor.[37] (Doc. No. 23 at 14). This argument is correct, so far as it goes. As this Court has previously concluded, "in the case of a facial challenge, the burden clearly falls on the challenger to show what needs to be shown, and not on the state (officials) to disprove the existence of what needs to be shown." *Doe #1*, 518 F. Supp. 3d at 1202. Given that Retroactive SORA's punitive effect (or lack thereof) is determined on the face of the statute, if this factor is ultimately to favor Plaintiff, then he does indeed bear the burden to demonstrate that Retroactive SORA lacks a rational connection to its conceded non-punitive purpose of preventing future acts of sexual violence. *See Seling*, 531 U.S. at 261 ("A court will reject the legislature's manifest intent [to establish a civil law] only where *a party challenging the Act provides the clearest proof* that the statutory scheme is so punitive in either purpose or effect as to negate the State's intention.") (emphasis added). In other words, this factor will not go

---

[36] Specifically, the Governor and TBI Director conceded for purposes of summary judgment in *Jordan* and *Reid* that "[t]here is no evidence tending to show that the Act generally reduces the incidence of criminal offenses," and that "[t]here is no evidence to show any other societal benefits of the Act." *Jordan*, 2022 WL 1196980, at *10 (brackets omitted); *Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *9 (brackets omitted).

[37] Defendants also argue that, to carry his burden, Plaintiff must show that SORA's "nonpunitive purpose is a 'sham or mere pretext.'" (Doc. No. 23 at 14 (quoting *Smith*, 538 U.S. at 103)). It is true that *Smith* suggests that such a showing will support a finding that the statute at issue is punitive. But it does not follow that a plaintiff *must* show that the non-punitive purpose is false or pretextual under this factor. Rather, as Plaintiff persuasively argues, the question is whether SORA's restrictions have a "rational connection" to the non-punitive interest, *Smith*, 538 U.S. at 97, "not whether that interest is false." (Doc. No. 25 at 4 n.6). Indeed, as Defendants concede in a later filing, *Snyder* does not support Defendants' view that such a showing is mandatory (rather than merely potentially helpful) for a plaintiff. (Doc. No. 30 at 14 n.3) (arguing that *Snyder* "neglected to consider this crucial component of the *Smith* decision"). Instead, as discussed further below, *Snyder* examined whether the evidence showed that Michigan's statute "in fact accomplishes its professed goals." 834 F.3d at 704.

in Plaintiff's favor unless he shows that it should; it is not enough for this factor to favor Plaintiff if Defendants merely *fail* to show that the factor favors them.

But even though Defendants are correct that Plaintiff bears the burden on this factor,[38] that ultimately does not help them. At this preliminary stage, Plaintiff need not carry this burden in the same way he would at a later stage of the case:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing.

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As the Court has already concluded, the empirical evidence thoroughly canvassed in *Snyder*, and to which Plaintiff's briefing refers, shows that Plaintiff is likely to succeed in showing that Retroactive SORA lacks a rational connection to a non-punitive purpose. (*See* Doc. No. 13 at 14–15). The Court does not mean to imply that a plaintiff will always (or even often) show a likelihood of success by pointing to evidence in a different case that persuaded a different court. But this context is unique in that (1) the Sixth Circuit recently analyzed a very similar sex offender registration statute from another state (2) on the basis

---

[38] To be clear, the fact that Plaintiff "bears the burden" on this factor does not mean that he *must prevail* on it in order to obtain a preliminary injunction. This is only one of five *Mendoza-Martinez* factors—albeit a "most significant" one—which are only "non-dispositive 'guideposts'" to aid the Court in analyzing whether Retroactive SORA is punitive in effect. *Snyder*, 834 F.3d at 701. Even if this factor did not favor Plaintiff, the Court could still in theory conclude that Retroactive SORA is punitive in effect based on the remaining factors (and possibly other considerations). Moreover, at the preliminary injunction stage, the question is only whether Plaintiff is *likely* to succeed in showing that Retroactive SORA is punitive in effect. And even then, Plaintiff's likelihood of success must be weighed against the remaining preliminary injunction factors. In any event, the Court concludes herein that Plaintiff *is* likely to prevail on this factor, so in that sense he "carries his burden." But the Court makes these observations to ensure that, in its discussion over who bears the "burden" on one *Mendoza-Martinez* factor, an extended discussion of one tree does not obscure the forest.

of generally applicable empirical studies and (3) these same Defendants have recently conceded that they may lack countervailing evidence. Given all this, the Court finds that Plaintiff has shown he is likely to prevail on this factor by pointing to *Snyder*.

> ### v. Is Retroactive SORA excessive with respect to the state's alleged non-punitive purpose?

This factor is closely related to the last one because "both consider the degree to which a law serves its stated civil purpose, as opposed to, for example, a desire for retribution or stigmatization appropriate only in the criminal context." *Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *15. In analyzing this factor, *Snyder* looked for evidence of the Michigan statute's "salutary effects" to compare against its "punitive effects." 834 F.3d at 705. *Snyder* found "no evidence in the record that the difficulties the statute imposes on registrants are counterbalanced by any positive effects." *Id.* In particular, with respect to the requirement that registrants make "frequent, in-person appearances before law enforcement," the court found "no relationship to public safety at all." *Id.*

At the preliminary injunction stage, Plaintiff has demonstrated a likelihood of success on this factor. Following *Snyder*'s lead, this Court has previously found that SORA is facially excessive with respect to its asserted non-punitive purpose of preventing recidivism because it likewise lacks sufficient salutary effects to justify its punitive consequences. *Doe #1*, 518 F. Supp. 3d at 1202 ("The Court . . . is not willing to blindly assume that periodic mandatory visits to law-enforcement offices actually help[] law enforcement keep a proverbial eye on the registrant in a way that actually deters the registrant from re-offending in between visits."). And these same Defendants have recently suggested in similar litigation that they may lack evidence of SORA's countervailing benefits. *Jordan*, 2022 WL 1196980, at *18; *Reid II*, —F. Supp. 3d—, 2022 WL 1050645, at *18.

Defendants point to *Smith*, in which the Supreme Court observed that "[t]he excessiveness inquiry of our *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." 538 U.S. at 105. Based on this reasoning, Defendants argue that this Court may not engage in a "tailoring" inquiry on this factor. (Doc. No. 23 at 15). However, *Smith* does not say that *all* analysis of the legislature's "tailoring" is impermissible under this factor. To the contrary, some degree of means-ends analysis is inherent in *Smith*'s statement that the question is whether the means chosen are "reasonable" in light of the legislature's non-punitive end. *Smith* does say that the legislature need not have made the "best choice possible" to address the problem. 538 U.S. at 105. But it is certainly possible to weigh the salutary and punitive effects against one another to determine whether the legislature has made *a permissible choice*, without requiring the legislature to make *the best choice possible*. Indeed, that is what *Snyder* (which is binding precedent) clearly requires. *See* 834 F.3d at 705.

Defendants' remaining arguments on this factor all suffer from a common flaw: they each note the scope, scale, or risk of sexual assault and rape offenses, but fail to point to *evidence* (as opposed to sheer intuition) that Retroactive SORA's restrictions actually prevent such offenses. For example, Defendants cite statistics about medical expenses and other costs associated with sexual assault and rape offenses throughout the United States generally and argue that the state has "an intense interest in mitigating the economic and noneconomic costs of such crimes." (Doc. No. 23 at 16). The Court does not doubt the sincerity and magnitude of the state's interest in preventing such crimes. But as Plaintiff correctly points out, these data show only the high costs of sexual crimes, "not that SORA is an effective way to prevent them." (Doc. No. 25 at 4). And, in any

event, statistics regarding *nationwide* costs for all sexual assault and rape offenses are overinclusive in considering whether Retroactive SORA's restrictions are excessive in light of its asserted non-punitive purpose.

Defendants further cite Department of Justice statistics that, according to Defendants, show that many SORA-protected areas, including schools, daycares, and outdoor public locations, "fall within the categories accounting for the vast majority of locations of sexual assaults in Tennessee not committed in a home or hotel." (Doc. No. 23 at 17). But again, the mere fact that a large fraction of sexual assaults occur in locations protected by Retroactive SORA does not show—as would be required to support Defendant on this particular factor—that *Retroactive SORA actually has salutary preventative effects* on future sexual assaults in those locations (or anywhere else).

Defendants also point to the specific provision of Retroactive SORA that prohibits residence or overnight visitation at a residence in which a minor resides or is present. *See* Tenn. Code Ann. § 40-39-211(c). Defendants argue that this provision is beneficial because "[t]he risk of sexual assault is pronounced in residences." (Doc. No. 23 at 18). However, this argument once again appears to rely on sheer intuition about the provision's salutary effects, not evidence. In *Snyder*, the Sixth Circuit "cautioned courts against using intuition to make a decision regarding the rational connection" between a sex offender registry law's restrictions and its professed goals. *See Doe #1*, 518 F. Supp. 3d at 1199 (citing *Snyder*, 834 F.3d at 705). Without supporting evidence, Defendants' intuition about the efficacy of this provision—no matter how sensible—does not undermine Plaintiff's likelihood of prevailing on this factor.[39]

---

[39] Defendants have provided a declaration from Henrietta Kerley, a sex offender compliance officer with the Cumberland County Sheriff's Office. (Doc. No. 23-2). In her declaration, Officer Kerley describes widespread community support for SORA. (*Id.* at ¶ 6 ("The community loves having the ability to check for offenders in their neighborhoods."); *id.* at ¶ 8 ("The residents of this county want to know if there are registered offenders in their neighborhood."). Defendants contend

### vi.    Conclusion

All five *Mendoza-Martinez* factors favor Plaintiff. Based on the Court's analysis of the *Mendoza-Martinez* factors—and given that neither the parties nor the Court have identified additional factors relevant to the analysis—the Court concludes that Plaintiff is likely to show that Retroactive SORA is punitive on its face, and thus is likely to prevail in his ex post facto challenge.

### B. <u>Irreparable harm to Plaintiff</u>

The second preliminary injunction factor is whether the movant (Plaintiff) would suffer irreparable injury without the injunction. When a constitutional right is threatened or impaired, "a finding of irreparable injury is mandated," *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001), or is at the very least "presumed.'" *Vitolo*, 999 F.3d at 360 (quoting *Obama for Am.*, 697 F.3d at 436). By establishing a likelihood of success on the merits of his constitutional claim, Plaintiff therefore also establishes a presumption that the irreparable injury factor favors granting a preliminary injunction. Defendants do nothing to rebut this presumption. Instead, Defendants argue that "a finding of irreparable injury is only mandated *if* Plaintiff shows a significant possibility that he will succeed on the merits of his claims," thus effectively conceding that the first and second factors rise and fall together. (Doc. No. 23 at 19).

In addition, Plaintiff has presented undisputed evidence that he is presently unable to reside with his family and has spent every night since April in a hotel room on pain of arrest. (Doc. No.

---

that these averments support finding that Retroactive SORA is not excessive in relation to its asserted non-punitive purpose. (Doc. No. 23 at 18). However, Officer Kerley's observations appear to be aimed at the Act's registration and publication provisions, which (as explained above) are not retroactive as applied to Plaintiff and which the Court thus will not enjoin. In any event, it is unclear what relevance community support, no matter how strong, has to the instant analysis— other than to highlight that sex offenders are a disfavored minority group potentially in need of protection from ex post facto laws. "[T]he fact that sex offenders are so widely feared and disdained by the general public implicates the core counter-majoritarian principle embodied in the Ex Post Facto clause." *Snyder*, 834 F.3d at 705–06.

12-1 at ¶ 15; Doc. No. 25-4 at ¶¶ 2–3). He is also unable to attend church or travel with his family. (Doc. No. 12-1 at ¶¶ 14, 16.) Plaintiff's inability to engage in these basic aspects of family life, based on a law he will likely be able to demonstrate is unconstitutional as retroactively applied to him, further supports the conclusion that he is irreparably harmed. *See Reid I*, 476 F. Supp. 3d at 708–09 ("The irreparable harm that Reid faces, moreover, does not end with his constitutional rights. While Reid complains of many features of the Act, he has made clear that some of the restrictions most distressing to him are those that interfere with his ability to be an active father and stepfather. Reid has two young children who will not stop aging and growing while this case works its way through litigation. Every school activity or event that he is unable to share with them is one he will never get back. This factor therefore strongly supports issuance of the preliminary injunction.").

Defendants argue that, even if the Court grants a preliminary injunction, any such injunctive relief should be limited to the specific harms Plaintiff has identified—*i.e.*, the restriction on his attendance at church and overnight residence in a house with minor children. Defendants argue that Plaintiff has not alleged any other irreparable harm. (Doc. No. 23 at 19). *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 599 (6th Cir. 2012) (suggesting district courts should fashion "injunctive relief tailored to the identified harm"). The Court understands Defendants to effectively argue that any preliminary injunction should be limited to the specific provisions prohibiting Plaintiff from attending his church and from spending the night at his home. *See* Tenn. Code Ann. § 40-39-211(c), (d).

However, under *Seling*, the Court determines whether Retroactive SORA is punitive on the basis of *all of its provisions*. And since the Court has determined Retroactive SORA as a whole is punitive on its face (and thus cannot be applied retroactively under the Ex Post Facto Clause), the

Court also concludes that Plaintiff is irreparably harmed by the application of *all* of Retroactive SORA. *See Bonnell*, 241 F.3d at 809 ("if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated"). Defendants' request that the Court hunt through the facially punitive Retroactive SORA to determine which provisions are (and which are not) irreparably harming Plaintiff is inconsistent with these principles.[40]

## C. Harm to Defendants and the public interest

The final two factors—harm to others and harm to the public—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Daunt*, 956 F.3d at 422. Defendants primarily direct their arguments on the third and fourth factors to the registration and publication requirements. Defendants argue that members of the public benefit from dissemination of information on the SOR because it allows the public to decide whether to live near and interact with individuals who may pose a risk of recidivism. (Doc. No. 23 at 20). Similarly, Defendants argue that law enforcement benefits from using SOR information to investigate suspected recidivists. (Doc. No. 23 at 21). But as explained above, the registration and publication requirements of SORA are not retroactive as to Plaintiff and thus do not violate the Ex Post Facto Clause as applied to him. Accordingly, these arguments by Defendants provide no reason against enjoining Retroactive SORA.[41]

---

[40] Defendants also argue that the Court's injunction should not require removal of Plaintiff's information from the SOR, because Plaintiff has not shown irreparable harm from inclusion of such information on the SOR alone, and because some courts have declined to order removal from the SOR on the basis that the statute creates a process for applying to the TBI Director for removal. (Doc. No. 23 at 19–20). As discussed above, the Court agrees that it would be inappropriate to order Plaintiff's removal from the SOR entirely—not for the reasons Defendants assert, but instead because the registration requirement is not retroactive as applied to Plaintiff.

[41] The third factor requires the Court to examine whether the injunction "would cause substantial harm to the opposing party *or others.*" *Tailgate Beer, LLC v. Boulevard Brewing Co.*, No. 18-cv-00563, 2019 WL 5208186, at *3 (M.D. Tenn. Oct. 16, 2019) (citing *Bays*, 668 F.3d at 818–19).

Defendants also argue that the Act's various 1,000-foot distance restrictions serve the public interest because they "reduce the opportunity for offenders to recidivate by limiting their contact with potential victims in the places where offenders are more likely to reoffend." (Doc. No. 23 at 21). In support of this assertion, Defendants point to the declaration of Officer Kerley, who states her belief that SORA reduces recidivism because she "believe[s] that some offenders are opportunist[ic]," and that "[w]hen an offender knows they are required to register, have periodic residential verification, and laws to abide by that are enforced it narrows the opportunity for the offender." (Doc. No. 23-2 at ¶ 7). However, the beliefs of one individual, no matter how well-intentioned or sincerely held, are not sufficient to tip this factor in Defendants' favor. *Cf. Snyder*, 834 F.3d at 704–05 (cautioning against relying on intuition, and instead looking to evidence from empirical studies regarding recidivism and the efficacy of sex offender registry laws).

Indeed, the factual record before the Court at this preliminary stage casts significant doubt on the notion that Plaintiff really poses a risk of recidivism. According to Plaintiff's declaration, he has been convicted of only a single criminal offense (Doc. No. 12-1 at ¶¶ 3, 18); his record, therefore, reflects an absence of recidivism thus far. As for his sole offense, committed against his 14-year-old stepchild in 2002, it undoubtedly was serious; not without reason, he served more than three years in prison for it. But Plaintiff did not violate his parole, and he underwent sex offender therapy. (*Id.* at ¶ 4). This, together with the above-referenced apparent absence of offenses in the last twenty years (other than his February 2022 arrest for failure to register under SORA that sparked this litigation), suggests a relatively low risk of recidivism. Plaintiff's record effectively

---

Defendants do not identify any *specific* third parties (as opposed to the public or law enforcement, generally) that they contend would be harmed by issuance of the preliminary injunction.

counters Defendants' claim that the public will be harmed unless Plaintiff is prohibited from living or working within 1,000-feet of parks and schools.[42]

Moreover, "no cognizable harm results from stopping unconstitutional conduct, so 'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Vitolo*, 999 F.3d at 360 (quoting *Deja Vu of Nashville, Inc.*, 274 F.3d at 400); *accord Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("[T]he public interest is served by preventing the violation of constitutional rights."). And although it is often stated that a state is harmed "'[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of its people,'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)), that principle cannot really be as broad as it seems at first blush, or else these factors might cut against preliminarily enjoining *all* state laws, including unconstitutional ones. Instead, the Court understands that "any time" actually appears to mean only when the statute at issue is *not unconstitutional*. *See Thompson v. DeWine*, 959 F.3d 804, 812 (6th Cir. 2020) (per curiam) ("Unless the statute is unconstitutional, enjoining a 'State from conducting its elections pursuant to a statute enacted by the Legislature would seriously and irreparably harm the State.'") (alterations omitted) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)); *Planned Parenthood Great Nw., Haw., Alaska, Ind., and Ky., Inc. v. Cameron*, No. 3:22-cv-198, 2022 WL 1698085, at *13 (W.D. Ky. May 26, 2022) ("a state only suffers an irreparable injury when the Court enjoins a law that does not violate the Constitution"). And so this principle

---

[42] Defendants also point to the substantial costs of sexual assault and rape offenses (monetary and otherwise) as reasons why the third and fourth factors cut against preliminary injunctive relief. (Doc. No. 23 at 20). But again, the costs alone are not probative without evidence that enforcing Retroactive SORA against Plaintiff would actually *mitigate* those costs.

does not really help the state where, as here, the statutory provisions at issue appear (at this early stage) likely to be held unconstitutional.

Accordingly, the third and fourth factors support granting a preliminary injunction.

D. Balancing the preliminary injunction factors

In sum, the Court finds that Plaintiff is likely to succeed on the merits of his ex post facto challenge; that he will suffer irreparable injury without an injunction; and that issuance of the injunction would not cause substantial harm to Defendants, the public, or any specific third parties. Therefore, finding the requisite irreparable injury, and then balancing all of the factors, the Court determines that a preliminary injunction should issue.

E. Security requirement

Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Yet, 'the rule in the Sixth Circuit has long been that the district court possesses discretion over whether to require the posting of security.'" *Ever-Seal, Inc. v. Halferty*, No. 3:22-cv-00082, 2022 WL 418692, at *10 (M.D. Tenn. Feb. 10, 2022) (brackets omitted) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)).

Plaintiff argues that the Court should exercise its discretion not to require the posting of security "in light of the strength of Plaintiff's claim, the public interest, and the unlikelihood that Defendant[s] will incur damages or costs if enjoined." (Doc. No. 13 at 18–19). Defendants do not respond to this argument.

The Court agrees that Defendants are unlikely to incur more than minimal costs in complying with the preliminary injunction described herein. *See Reid I*, 476 F. Supp. 3d at 709

(M.D. Tenn. 2020) ("[A]ny costs to the defendants appear to be so minimal that the court concludes that no cash surety would be necessary 'to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.'") (quoting Fed. R. Civ. P. 65(c)). Accordingly, the Court will exercise its discretion not to require Plaintiff to post security for the preliminary injunction to be entered in accordance with this opinion.

CONCLUSION

For the reasons discussed herein, Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 12) will be granted in part and denied in part. The Court will grant the Motion insofar as it seeks a preliminary injunction, with the exception that the Court will not order (1) that Plaintiff's information be removed from the SOR, or (2) that Plaintiff's information not be published on the SOR.[43] The Court will deny the motion as moot insofar as it seeks a temporary restraining order.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[43] For the avoidance of doubt, the Court clarifies that its preliminary injunction will expressly permit Defendants to continue publishing Plaintiff's information on the SOR in compliance with Tenn. Code Ann. § 40-39-206(d), since that provision is not retroactive as to Plaintiff.

Although the Court's preliminary injunction will not require Defendants to remove Plaintiff's information from the SOR, the preliminary injunction *will* prohibit Defendants from using any authority conferred under SORA to require Plaintiff to update his registration information. *See* Tenn. Code Ann. § 40-39-203(a). Accordingly, if Defendants elect to retain Plaintiff's information in the SOR and to continue to publish it (as the Court's injunction will permit them to do), they do so on the understanding that they cannot use SORA to compel Plaintiff to update that information to ensure its accuracy. To the extent Defendants may have the ability (and the inclination) to update Plaintiff's registration information through means other than SORA, the propriety of Defendants' doing so is not before the Court at this time, and the Court's preliminary injunction will not prevent Defendants from doing so.